WALKER ICE COMPANY *vs.* AMERICAN STEEL AND WIRE COMPANY.

Worcester.   September 30, 1902. — May 17, 1904.

Present: KNOWLTON, C. J., MORTON, LATHROP, BARKER, HAMMOND, LORING, & BRALEY, JJ.

*Landlord and Tenant.   Easement.   Practice, Civil.   Evidence.*

A lease to a manufacturing company, operating a steam plant, of an artificial pond " to be used for flowage purposes only . . . with the exclusive right to flow,

store and use water in said pond " to a certain height, reserving the exclusive right to cut and sell ice from the pond, grants only the right to store and use the water in its natural condition, and does not give the lessee the right to turn into the pond hot water from its condensers and store it there so as to melt the ice, although this may be reasonably necessary for the proper operation of its steam plant. LORING, HAMMOND, & BRALEY, JJ. dissenting on the ground that, if the evidence shows that the right to turn hot water into the pond is necessary to keep the steam plant in operation, such a right is included in the grant, and that the exclusion of evidence tending to show this fact is erroneous.

The owner of an artificial pond, which he has leased to a manufacturing company with the exclusive right to store and use water there at its natural temperature, reserving the exclusive right to cut ice from the pond as used in connection with certain land and buildings owned by him adjoining the pond, may give orally to a tenant at will, holding over after the expiration of a lease in writing of the land and buildings and the right to cut ice in connection therewith, all the rights which he has enjoyed under his lease, and in such case the tenant at will has not a mere license to cut ice but a property right in the ice before it is cut, and may maintain an action against the manufacturing company for destroying an uncut crop of ice by turning into the pond hot water from its condensers. LORING, HAMMOND, & BRALEY, JJ. dissenting.

It is proper to refuse a request for an instruction which assumes as a fact one of the matters in controversy.

Conversations between the owner of land and one claiming to be a tenant at will of the land are admissible for the purpose of showing the existence of the tenancy at will and what is included by its terms, and it is no objection to the admission of such evidence that it tends to vary the terms of a lease from the owner of the land to another person claiming adversely to the alleged tenant at will.

No exception lies to the exclusion of evidence if the same evidence in substance already has been admitted without objection and it does not appear that the party offering the evidence has been harmed by the exclusion.

Evidence of the course of conduct of the parties to a lease admissible to show the construction put upon it by them is confined to the conduct of the lessor and lessee and those claiming under them, and does not include evidence of the conduct of the lessee and of one claiming a right adverse to the lessee as tenant at will of the lessor, where it does not appear that the lessee was acting under a claim of right or that such a claim was acquiesced in by the lessor or that the lessor knew of the conduct of the lessee.

TORT for the alleged destruction of an uncut crop of ice on Salisbury Pond in Worcester by great quantities of hot water poured into the pond by pipes and conduits from the defendant's factory. Writ dated June 16, 1900.

In the Superior Court the case was tried before *Hopkins*, J. Certain evidence described and referred to in the opinion of the court and in the dissenting opinion was offered by the defendant and excluded by the judge subject to exceptions by the plaintiff. The defendant requested the following rulings:

" 1. That upon the evidence the plaintiff has established no cause of action on the pleadings, and the verdict must be for

the defendant.   2. That upon the evidence the plaintiff cannot maintain its action against this defendant.   3. That the defendant had the exclusive right to use the waters of Salisbury Pond in any manner.   4. That if the defendant used the waters of the pond only in such manner as was reasonably necessary for the carrying on of its business, then even though such use prevented the plaintiff from taking ice, the defendant was within its legal rights, and the plaintiff has established no cause of action.   5. That the plaintiff had no exclusive right to take ice from Salisbury Pond in January, 1900.   6. That any right the plaintiff had to cut or take the ice in January, 1900, was subordinate to the defendant's exclusive right to use the entire waters of Salisbury Pond for any purpose.   7. That the extent of the plaintiff's right to cut or take ice was limited to such opportunity to cut or take the same, subordinate to the right in the defendant to use the entire waters of the pond.   8. That the only right the plaintiff had to take or cut ice was limited to such opportunity as might exist, subject to the defendant's right to use the entire waters of the pond.   9. That under the lease to the defendant's admitted predecessor in title, in January, 1890, no valid reservation was created, and the lessee took the entire waters of the pond, subject to no restriction or reservation.   10. That under the lease of 1890, the plaintiff took, and has, no right under the words of reservation.   11. That under the lease of 1890, the defendant had the exclusive right to use, store, or flow the water into Salisbury Pond without any regard to the taking of ice by the plaintiff.   12. That the evidence that the defendant, or its predecessors in title, at the request of the plaintiff or its predecessors, suspended temporarily the return of water to Salisbury Pond, cannot be taken as establishing any right of the plaintiff as against the defendant."

The judge refused to make any of these rulings.   The jury returned a verdict for the plaintiff in the sum of $12,000; and the defendant alleged exceptions, which after the death of *Hopkins*, J. were allowed by *Gaskill*, J.

The case was argued at the bar in September, 1902, before *Morton, Lathrop, Barker, & Loring*, JJ. of the present court and also *Holmes*, C. J., and afterwards was submitted on briefs to all the justices.

*H. Parker*, (*G. A. Gaskill* with him,) for the defendant.

*A. P. Rugg*, (*W. C. Mellish* with him,) for the plaintiff.

MORTON, J.    This is an action of tort to recover damages for the alleged destruction by the defendant of a crop of ice on Salisbury Pond in Worcester which the plaintiff was preparing to harvest.    There was a verdict for the plaintiff and the case is here on exceptions by the defendant to the admission and exclusion of evidence, and to the instructions that were given and refused.    The plaintiff contended that the ice was destroyed by the turning into the pond by the defendant of hot water from its condensers.    The defendant admitted turning in hot water but denied that the destruction of the ice was caused thereby ; the verdict must, however, be taken to have settled this issue against it.

Salisbury Pond is an artificial pond.    It and the premises on the shore occupied by the plaintiff and its predecessors formerly belonged to Stephen Salisbury, Sr., and on his death in 1884 passed to his son Stephen Salisbury, Jr., the present owner. The pond was originally established and is principally used to furnish water for manufacturing purposes.    But for 'upwards of thirty years, the plaintiff and its predecessors, first as tenants of Stephen Salisbury, Sr., and then of the son, have occupied the premises on the shore of the pond for the ice business, and have cut and taken ice from the pond in connection therewith. Formerly this tenancy was under written leases.    The last written lease that was put in evidence by the plaintiff was one from Stephen Salisbury, Sr., to Benjamin Walker in 1878 for five years.    Upon its expiration it was extended in writing for three years more upon the same terms and conditions.    The extension expired in 1886 and since then the plaintiff and its predecessors have occupied the premises and cut and taken ice upon the same terms and conditions as contained in the lease of 1878, except that each was to give the other six months' notice of an intention to terminate the tenancy.    The lease of 1878 bounded the premises in part on the shore of the pond, and provided that " the premises are to be used for a dwelling house and other buildings for the ice business during the term of this lease, as at the present time."    It also contained a provision that the " said Salisbury doth also lease to said Walker the right to cut

and take ice from Salisbury's Pond as is done at this time during the term of this lease," and a further provision that in addition to the stipulated rent the lessee should "deliver to the lessor as much ice as shall be required for two families during the term of this lease, as is done at this time." The plaintiff has paid the rent and has done all the other things required. As we construe this lease it demised the premises on the shore of the pond with the privilege of cutting and taking ice as appurtenant thereto. The rent reserved was not apportioned between the premises and the right to cut and take ice, but consisted of a round sum ; and this taken in connection with the situation of the premises on the shore of the pond, and the provision that they were to be used for the ice business, renders, it seems to us, the construction which we have given to the lease the only reasonable one. See *Huntington* v. *Asher*, 96 N. Y. 604. Strictly speaking a right to cut and take ice is, perhaps, more in the nature of a *profit à prendre* than an easement, though it comes within the definition of an easement which was given by Chief Justice Shaw in *Ritger* v. *Parker*, 8 Cush. 145, 147, and which was quoted with approval by the court in *Owen* v. *Field*, 102 Mass. 90, 103. But whether regarded as an easement, or as a *profit à prendre*, the right was capable of being annexed to the premises which were demised (see *Huntington* v. *Asher, ubi supra*), and must be considered, we think, according to the true construction of the lease as having been so annexed. Upon the termination of the written lease, the occupancy did not cease, but the relation of landlord and tenant continued between Mr. Salisbury and the parties in possession, — the only difference being that instead of being in under a written lease and for a fixed term, they were in by parol and as tenants at will. In holding over whether by mutual consent and agreement or otherwise they held the same premises with all the rights and privileges that had been annexed to them, and upon the terms and conditions specified in the written lease, except so far as modified by mutual arrangement. *Dimock* v. *Van Bergen*, 12 Allen, 551. *Weston* v. *Weston*, 102 Mass. 514, 518. *Webber* v. *Shearman*, 3 Hill, (N. Y.) 547. They were not in any sense licensees, but were tenants at will. And if the landlord had deprived them of the right to cut and take ice, it would have

constituted a substantial interference with their right of quiet enjoyment, if not an eviction. *Brown* v. *Holyoke Water Power Co.* 152 Mass. 463. *Case* v. *Minot,* 158 Mass. 577. The occupation has been a continuous one since the expiration of the lease, and the successive changes rendered necessary by death and the taking in of new partners and the change from a partnership to a corporation have not interrupted the tenancy, and have all been agreed to by Mr. Salisbury. If the case had stopped here, there can be no doubt, we think, that the plaintiff had such possession of the ice that the defendant would be liable for the damage done in causing its destruction by turning hot water into the pond.

But the case does not stop here. The defendant claims under a written lease from Mr. Salisbury, of what it asserts is the pond and the land under it, to the Washburn and Moen Manufacturing Company, to whose rights it is admitted that the defendant has succeeded, and it contends that under this lease it had the right to turn in hot water, and that if the plaintiff has a right to cut and take ice, which it denies, the right is subject to its right to flow, store and use the water of the pond for manufacturing purposes. It also contends, and this is the ground on which it denies the plaintiff's right to cut and take ice, that the plaintiff derives any right or privilege that it has to cut and take ice from the reservation to Mr. Salisbury contained in the lease, that that created an easement in gross in favor of Mr. Salisbury which could only pass by grant, and that, having no grant, the plaintiff was only a licensee, and, not having reduced the ice to possession at the time when it was destroyed, has no cause of action against the defendant. This renders it necessary to consider the lease under which the defendant claims. If the construction contended for by the defendant is correct, it is manifest that the conclusion for which it contends must follow. But we do not think that the construction for which it contends is correct.

Omitting what is not essential in the consideration of the case before us, what was demised by the lease to the Washburn and Moen Company was "that tract of land lying on the westerly side of said Grove Street as shown on a plan recorded herewith . . . comprising the area known as Salisbury Pond, to be used

for flowage purposes only . . . with the exclusive right to flow, store and use water in said pond by means of its dam and flash boards, at a height," etc.   Later in the lease is the following reservation: "The said lessor for himself, his heirs, executors, administrators and assigns reserves the exclusive right to cut, harvest, sell or store for sale, ice from said Salisbury Pond, as at present exercised by B. Walker & Company during the lease or its extension."   The lease was dated January 31, 1890, and was for twenty-five years from July 1, 1888.   There had been an earlier lease from Mr. Salisbury, Sr., to the Washburn and Moen Company which was offered in evidence by the defendant and excluded subject to its exception.   This lease was dated the first day of July, 1868, and expired on the same day as that, under which the defendant now claims, took effect.   What was demised by that lease was "all the water in Salisbury Pond on the north side of Grove Street . . . to be used for manufacturing purposes . . . subject to the reservation hereinafter expressed."   The reservation so far as material was as follows: The "said Salisbury reserves to himself, his heirs and assigns, during the term of this lease, the right to take ice from the pond as heretofore."   The Washburn and Moen Company was and is a large manufacturing establishment, which the defendant operates, and the water taken from the pond is used for steam and condensing purposes.

The first question is whether the defendant had the right under its lease to turn hot water into the pond as it is found that it did.   We do not think that it had.   No doubt, if Mr. Salisbury had seen fit to do so, he could have leased the pond and the land under it to the Washburn and Moen Company or to the defendant, so as to give it the right to turn in hot water, and have made the right to cut and take ice subject thereto, leaving the plaintiff and its predecessors to such remedy, if any, as they might have against him.   But it does not seem to us that he has done so.   The lease contains an express reservation to himself, his heirs and assigns, of the right to cut and take ice as at present exercised by B. Walker and Company.   The earlier lease that was offered and excluded contained a similar reservation.   The effect of these reservations is to rebut any intention on his part to give the Washburn and Moen

Company a right in the waters of the pond or in the pond itself superior to the right to cut and take ice. And the reference to B. Walker and Company, though that was not the style of the firm then carrying on the ice business, which was the Walker Ice Company, a successor to B. Walker and Company, shows plainly, it seems to us, a purpose on his part to protect the rights of those in occupation of the premises on the shore of the pond and engaged in cutting and taking ice, from interference therewith on the part of the Washburn and Moen Company, and to make the rights demised to that company in the waters of the pond subject to the right to cut and take ice. The reservation is in the nature of an exception and should be so construed. *Hamlin* v. *New York & New England Railroad*, 160 Mass. 459. Even if, therefore, the lease gave to the defendant the right to turn in and store hot water, we think that the right was subject to the plaintiff's right to cut and take ice.

But we do not think that there is anything in the lease or the circumstances under which it was executed which gave to the Washburn and Moen Company the right to turn in and store hot water, though no doubt it might do so, so long as nobody interested objected. The lease demised the pond and the land under it for flowage purposes only with the exclusive right to flow, store and use the water as high as a certain bolt. There is nothing, in terms at least, which gives the right to turn in and store hot water, and we think that the rights that are given have reference to water in its natural condition as it comes in the ordinary course of nature, from the ponds and streams in which it has gathered, to the dam and is held back by that to the height prescribed. This is the natural construction, particularly of the right of flowage, and there is nothing to show that the language was used in any other sense or should receive a different construction. The fact that the defendant was and is a manufacturing establishment and used the water for steam and condensing purposes does not show and has no tendency to show that the lease should be construed so as to give it the right to turn in and store water that had been used for steam and condensing purposes. Neither does the fact that the pond was originally established to furnish water for manufacturing purposes and that the cutting and taking of ice was an incidental matter show that

the lease should be so construed.   The question is one of construction.   With these facts before them and all that might be properly inferred as to their knowledge respecting what was done in steam plants operated as that of the Washburn and Moen Company was, and what was or might be reasonable and necessary for the operation and economical running of that plant in the way of turning back water when the supply was short, the parties have seen fit to use language whose only reasonable construction is that it applies to water in its natural condition and does not include the right to turn in and store water that has been used for steam and condensing purposes.   The question is not what is necessary and proper for the economical running of a steam plant where water is used for condensing purposes, or what, under certain circumstances, it may be necessary and proper to do in the way of returning water to the pond or the source of supply to keep the plant in operation, but whether the language which the parties have used in the lease can or should be so construed as to include the right to turn hot water into and store it in the pond, and for reasons which we have given we are of opinion that it cannot and should not be so construed.   With the consequences of what we think is the true construction we have, of course, nothing to do.   The Washburn and Moen Company should have provided for them in the lease if it anticipated them, and if it did not anticipate them it is not for the court to supply the omission.   However great his necessity one riparian owner would have no right to foul the water of a stream, or turn in hot water to the injury of another riparian owner (*Merrifield* v. *Lombard*, 13 Allen, 16 ; *Mason* v. *Hill*, 5 B. & Ad. 1), and we cannot think that, under a lease of a pond and the land under it for flowage purposes only, with the exclusive right in the lessee to flow, store and use the water held back by the dam, the lessee would have any greater right to interfere with the natural condition of the water as against one having the right to cut and take ice from the pond.   If the rule that doubtful words are to be taken most strongly against the grantor, has any application to a case like this, which we do not concede, since the instrument is an indenture, and the case is not one between the parties to it, nevertheless the words are to be interpreted according to their natural meaning and effect as applied

to the subject matter (*Simonds* v. *Wellington*, 10 Cush. 313), and so interpreted in the case before us the lease does not, it seems to us, include the right to turn in and store hot water in the pond.

The view which we have taken as to the purpose and effect of the reservation renders it unnecessary to consider further the contention of the defendant that the reservation operated to create an easement in gross in favor of Mr. Salisbury, and that the easement so created is the source of the plaintiff's right, if it has any, to cut and take ice. But we do not see how an easement, in gross or otherwise, can be acquired by the owner of the fee in his own land. An easement in gross is a purely personal right in land belonging to another.

It follows from what we have said that the defendant's first and second requests, that on the pleadings and the evidence the plaintiff was not entitled to recover, were rightly refused. So also we think were the other requests. What we have said disposes of them all, except the twelfth, without considering them seriatim. They were all, except the twelfth, based, in one form or another, upon the contentions that the defendant had an exclusive right in and to the waters of the pond, or that the plaintiff's right, if it had any, was subordinate to that of the defendant, and that the defendant had the right to use the pond and the waters thereof in such manner as was reasonably necessary for the purpose of carrying on its business, even though the result was to prevent the plaintiff from taking ice, or to destroy ice that had been formed and was ready for harvesting. These contentions are manifestly inconsistent with the construction which we have given to the lease and with the views which we have expressed as to the rights of the parties. The twelfth request was properly refused. It assumed that the suspension, if there was one, was temporary and was in the nature of the suspension of a right which the defendant had to turn in hot water. To have given it would manifestly have been misleading.

We see no error in the instructions that were given. The plaintiff could fairly be said to be an assign within the meaning of the reservation, as the judge instructed the jury (*Mitcalfe* v. *Westaway*, 17 C. B. (N. S.) 658), though, as we have already said, the reservation was in the nature of an exception of the right to cut and take ice which remained in the possession of Mr.

Salisbury and his tenants, rather than an implied grant of an easement of the right to cut and take ice.

There remain the questions of evidence, which we proceed to take up so far as relied upon and argued by the defendant, treating the others as waived.

1. Conversations between the Messrs. Salisbury, father and son, and one White, the treasurer of the plaintiff, and for many years a tenant of the premises and the predecessor of the plaintiff, were admitted against the objections and exceptions of the defendant. We think that they were properly admitted for the purpose of showing that the plaintiff was occupying the premises as tenant at will, and what was included in and the terms and conditions of the tenancy. The plaintiff claimed adversely to the lease to the Washburn and Moen Company, and the objection that the evidence tended to vary the written contract contained in that lease has no force. The plaintiff had a right to show the terms, and conditions, and nature, and extent of its occupancy.

2. The defendant offered to show that the condensing process was reasonably necessary for the proper operation of a steam plant, that for twenty-five years the process of condensing under certain conditions and returning water to the source of supply had been a recognized method of operating steam plants and was reasonably necessary, that there were conditions, where the supply of water was limited, when the return of water to the pond to be cooled and used over again became absolutely necessary to the economical running of the plant and to keep it in operation, and that by reason of the condition of the water in the pond in December, 1899, and January, 1900, it was necessary in order to run the steam plant in its mill to turn back into the pond water which otherwise would have been wasted. This offer of evidence was excluded and we think rightly. It may be doubtful whether the defendant was harmed by the exclusion. It had been allowed to introduce by the cross-examination of one of the plaintiff's witnesses, and by the direct testimony of one of its own, evidence tending to show that condensing was a proper and necessary way to gain most efficiency for the engines, that the method of condensing employed at its mill was a long established system and was necessary for economy in running any steam

plant, and that it was necessary to turn back water into the pond in December, 1899, and January, 1900, to render the condensing system feasible. The testimony that was offered and excluded was the same in substance as that which was thus admitted without objection. We do not see, therefore, as we have already said, how the defendant was harmed by the exclusion. Furthermore, although the testimony was offered for the purpose of affecting the construction of the lease under which the defendant claims, there was no offer to show that Mr. Salisbury was cognizant, at the time when he executed the lease, of what may be termed the state of the art. But, assuming that he was cognizant of the facts that the defendant offered to show in regard to the condensing process and what it was or might be necessary or proper to do in turning back water, the conclusive answer to the contention that the evidence should have been admitted is, as already observed, that with these facts before them the parties saw fit to use language the reasonable construction of which not only does not include the right to turn back hot water into the pond, but excludes it.

3. Still further, the defendant offered to show, as bearing on the construction of the lease, that warm water had been discharged into the pond in years past by the Washburn and Moen Company when the plaintiff's predecessors were cutting ice. The evidence was excluded. It would seem that in this instance also the defendant was not harmed by the exclusion, since evidence to the same effect had been previously introduced by it without objection on the cross-examination of one of the plaintiff's witnesses. But in regard to this evidence, as well as that just considered, the defendant contends that it was admissible to aid in interpreting the phrase " as at present exercised by B. Walker & Company," used in the reservation in the lease of 1890; and the phrase, " as heretofore," similarly used in the reservation in the prior lease to the Washburn and Moen Company, and the phrase "*as is done at this time*" in the lease of 1878 to Benjamin Walker. But there is nothing to show that those phrases had any reference to the condition of things offered to be shown, or any relation thereto in any way. The obvious purpose and effect of the language referred to, when considered in connection with the rest of the provisions in which they are

found, was to secure to Mr. Salisbury and his tenants the full and unrestricted right to cut and take ice. Furthermore, the uncontradicted testimony showed, that when requested to do so by the plaintiff or its predecessors, in order to enable them to gather the ice, the Washburn and Moen Company stopped turning in hot water till the ice had been gathered, and they had been notified thereof, — which was a recognition of the plaintiff's right rather than an assertion of their own. And lastly, so far as the evidence was offered to show a course of conduct for the purpose of affecting the construction of the lease, it related not to the conduct of the parties to the lease or their privies, but to the conduct of the plaintiff and the defendant of which the lessor if that is material was not shown to have had knowledge, and there was nothing to show that the defendant turned in the hot water under a claim of right to do so under the lease and that this claim was acquiesced in by the lessor. The evidence was therefore inadmissible to affect the construction of the lease or the rights of the parties.

4. The defendant offered in evidence the prior lease from Mr. Salisbury to the Washburn and Moen Company, and, it was excluded subject to its exception. We do not see how the defendant was harmed by its exclusion. If it had been admitted, it could not, for reasons already given, have possibly affected the result.

The remaining exceptions to the admission and exclusion of evidence have not been argued and we treat them as waived.

For these reasons a majority of the court think that the exceptions should be overruled.

*So ordered.*

LORING, J. I am unable to concur in the opinion in this case.

This is an action by a corporation, claiming to be " lessee at will " of the exclusive privilege of cutting ice on Salisbury Pond, to recover damages for injury to a sheet of ice (which had formed on the pond and which the plaintiff had prepared for cutting and was about to cut) caused by hot water turned into the pond by the defendant on January 8 and 9, 1900.

Salisbury Pond is an artificial body of water which was made by damming up the waters of several brooks about the year 1840. The land under the pond and the water rights in the

pond were owned by Stephen Salisbury the elder until he died, in 1884, and then passed to his son, Stephen Salisbury the younger, who has since then been the owner of them.

It appeared, on the one hand, that by a lease dated in January, 1890, Stephen Salisbury the younger demised to the Washburn and Moen Manufacturing Company, among other things, " that tract of land lying on the westerly side of said Grove Street as shown on a plan recorded herewith containing as per plan one million ninety-three thousand seven hundred (1,093,700) square feet, comprising the area known as Salisbury Pond, to be used for flowage purposes only, . . . with the exclusive right to flow, store and use water in said pond by means of its dam and flash boards, at a height" stated. The term created by this lease began July 1, 1888, and ended July 30, 1913; and it was admitted that the rights of the Washburn and Moen Company under it had passed to the defendant. The Washburn and Moen Company had been in possession for twenty years prior to July 1, 1888, under a lease made in 1868 by Stephen Salisbury, Sr., and had a somewhat similar right to use the waters of Salisbury Pond. This earlier lease was offered in evidence by the defendant and excluded.

On the other hand, it appeared that it had been the practice to cut ice on Salisbury Pond from early times, the date when this practice began not being given. Stephen Salisbury, Jr., testified that " father used to cut ice himself, before Walker Sweetser cut it there." Then ice was cut by Walker and Sweetser, then by Benjamin Walker. And it appeared from other testimony that Benjamin Walker was cutting ice there as early as 1870. Then the ice was cut by Benjamin Walker and Company and then by a partnership known as the Walker Ice Company, and finally by the plaintiff corporation, which was organized in 1899. In 1878, Stephen Salisbury the elder, by an indenture of lease, demised to Benjamin Walker a tract of land bordering on the pond, " the premises to be used for a dwelling house and other buildings for the ice business," and also " the right to cut and take ice from Salisbury's Pond as is done at this time during the term of this lease." This lease expired in 1883, and was extended until 1886, and finally expired at that time. Since then the successors in the business of Benjamin Walker have repeat-

edly tried to get a written lease from the owner of the pond, Stephen Salisbury the younger, but without success. He has, however, agreed with them by word of mouth that they might hold on the terms of the lease of 1878. There is no pretence that the lease of 1878 has been assigned by Benjamin Walker to his successors in business, or that it has been kept alive by extensions. The practice of cutting ice on the pond has been carried on continuously down to the day when the ice was destroyed by the hot water turned into the pond in January, 1900.

There was evidence that the hot water complained of came from the condensers of the defendant's engines, and was turned into the pond in December, 1899, and from then until February 3, 1900, and that this was done in place of its being turned into the sewers, as had been done immediately before, because the waters of the pond were very low at that time.

The defendant offered to show that " during the past twenty-five years the process of condensing under certain conditions and returning water to the source of supply has been a recognized method of operating steam plants and is reasonably necessary." Before this evidence was offered, the plaintiff's witness, Stephen Salisbury the younger, had testified that " Salisbury Pond is an artificial pond constructed for manufacturing purposes," and that " the plant of the Washburn & Moen Company has been a steam power plant and the water has been largely used to generate steam," and that at that time, i. e. about 1870, " Washburn & Moen, or their predecessors, used the waters for manufacturing purposes, and the pond has been so used from 1840."

As I have already said, the Washburn and Moen Company were in possession of the same premises under a lease from Stephen Salisbury, Sr., for twenty years prior to the date when the lease in question, dated January, 1890, went into effect, and that that lease was offered in evidence and excluded. Had that lease been admitted in evidence, it would have appeared in connection with this testimony of Stephen Salisbury the younger that for a period of thirty-two years before the time of the grievances here complained of the Washburn and Moen Company and its successor and assignee, the defendant corporation, had been in the possession of a steam plant, with a right to use the waters of this pond for generating steam to run its plant.

In my opinion, under the facts in evidence, the lease dated January, 1890, must be construed in the same way as if it had been stated therein that the waters of Salisbury Pond could be used by the lessee to generate steam in running its steam plant situated on the borders thereof; and on this point I do not understand there is any difference of opinion between my brethren and myself.

It is plain to me that in determining whether as matter of construction the right to turn back water from its condensing engines is given by a lease of water to be used in generating steam to operate a manufacturing plant run by steam, the court cannot refuse to consider evidence that "during the past twenty-five years [including twelve and one half years under the lease and twelve and one half years prior thereto] the process of condensing under certain conditions and returning water to the source of supply has been a recognized method of operating steam plants and is reasonably necessary." It is so plain to my mind, that nothing can be added to the statement of it.

The defendant also offered to show by one Allen what had taken place in the past in the matter of discharging warm water into Salisbury Pond from the condensers of the steam plant which is now owned by the defendant and was then owned by the Washburn and Moen Manufacturing Company. Allen testified that he had been in business in Worcester since 1870; that he had lived near the pond all his life and was familiar with it, and that he had seen the discharge of warm water from the condensing engine into the waters of the pond in years past. He then was asked to state what he had observed in that regard. This was objected to, and on being asked how the question was relevant the defendant's counsel stated "If it is a fact that at an earlier time the predecessors of this plaintiff were cutting ice in that pond and when their rights as I assume must be referred to some extent to the conditions formerly obtained, — if at that time it appears that this condensing process of the discharge of warm water direct into that pond existed, I claim it to be material and important on one fact as determining the measure of the assumed right of the plaintiff."

It had appeared in evidence before this offer of proof was made that for thirty years prior to 1900, that is to say, from

1870 to 1900, there had been a pipe which took hot water from the condensers of the defendant's engines and carried it into Salisbury Pond; that this pipe was disconnected in 1890, after being in operation for twenty years, from 1870 to 1890, and remained disconnected for the next nine years, until the winter of 1899–1900 (that is, until the time of the grievances here complained of), when this old pipe was reconnected and another pipe, and afterwards a trough, were put in, which also took the water from the condensers into the pond.

The first ground on which evidence is admissible of what took place in the matter of the discharge of warm water from this old pipe from 1870 to 1890 is the fact that, by the terms of the agreement between Stephen Salisbury, Jr., and the plaintiff, that was the measure of the right to cut ice which Stephen Salisbury, Jr., gave to the plaintiff. By the terms of the oral agreement between the plaintiff corporation and Stephen Salisbury the younger, the right which he gave to it to cut ice was the right given in the written lease between Stephen Salisbury, Sr., and Benjamin Walker, in 1878, and the right given to Benjamin Walker by that lease was "to cut and take ice from Salisbury's Pond as is done at this time." It further appeared that the rights given by Stephen Salisbury the younger by word of mouth to the plaintiff's predecessors in business was also that given in the lease to B. Walker. The lease to B. Walker was in existence from 1878 to 1886; the period during which the old pipe was in operation was from 1870 to 1890. That is to say, the old pipe was in operation eight years before the written lease to Benjamin Walker during the time in which that lease was in operation and for fourteen years after it expired, during which the right given by word of mouth was the right to cut ice as was done when the lease to B. Walker was executed. I am unable to understand why the defendant was not at liberty to show what was done in the matter of discharging warm water into the pond during these thirty years, which include the whole term of the lease to Benjamin Walker, eight years before it began, and fourteen years after its expiration, when the measure of the right which Stephen Salisbury gave to the plaintiff was the right given to Benjamin Walker by the written lease, and the right given to Benjamin Walker was "the right to cut and take ice from Salisbury's Pond as is done at this time."

Not only is this evidence admissible on the ground that it is all Mr. Salisbury undertook to give to the plaintiff, but it is also admissible, in my opinion, on the ground that it is all Mr. Salisbury had to give.    All the right to cut ice which Mr. Salisbury had after the lease dated January, 1890, was the right reserved to him under the reservation in that deed, and the terms of that reservation were " to cut, harvest, sell or store for sale, ice from said Salisbury Pond, as at present exercised."

The old pipe was not disconnected until 1890 ; this lease, though dated January, 1890, went into operation July 1, 1888. I think it was competent to prove what was done during the first year and a half of this lease and for the years immediately before it began, in the matter of discharging warm water into the pond, because by the terms of the lease the right reserved to Mr. Salisbury was to cut ice "as at present exercised."

Moreover I think it was competent to prove what was done by the parties in the matter of discharging warm water into the pond prior to the lease and for the first one and one half years of the lease as the contemporaneous acts of the parties giving a construction to the lease.

In this connection, the defendant offered to show "that by reason of the state of the water and the supply in Salisbury Pond in December, 1899, and January, 1900, it was necessary to turn back water, which otherwise might have been wasted, into Salisbury Pond in order to run the steam plant in the mill."    It had previously appeared in evidence that the water in Salisbury Pond at that time was lower than it ever had been within the memory of man and that seven million five hundred thousand gallons were taken out of the pond daily by the defendant in generating steam, and two million nine hundred and fifty thousand gallons of hot water put back ; that this continued until February 3, 1900, when, owing to heavy rains which occurred at the end of January, " the water in the pond was high enough then to run the plant without turning it [the hot water] back " into the pond, in the words of one of the plaintiff's own witnesses.    This offer of evidence was made to complete the defendant's offer of proof.    If the defendant had a right to use the waters of the pond to generate steam, and if returning hot water from the condensers is a recognized method of operating steam

plants, it was incumbent upon the defendant to show that in the case at bar it was necessary for it, under the circumstances existing, to return the hot water into the pond in order to keep its steam plant in operation.

Neither can I concur in the disposition made in the opinion of the contention that by the true construction of the lease dated January, 1890, apart from the evidence I have already dealt with, the defendant had no right to turn hot water from the condensers into the pond. It is stated as a reason for this conclusion that the right to cut ice reserved to Mr. Salisbury in that lease operated by way of exception, under the doctrine peculiar to Massachusetts, acted upon in *Hamlin* v. *New York & New England Railroad*, 160 Mass. 459, and under consideration in *Simpson* v. *Boston & Maine Railroad*, 176 Mass. 359. But in determining whether the right retained by a grantor is superior to the grant or subordinate to it, it makes no difference whether the deed by which an easement is retained in the grantor operates by way of exception or by way of a grant back from the grantee, which is usually spoken of as a reservation. The corrective rights of an abutter on a railroad and of the railroad company in a private way over the railroad location are precisely the same, whether the deed retaining in the abutter a right to use the private way operates by way of exception or by way of reservation. The general rule of construction is equally applicable in both cases, that a deed shall be construed against the grantor, *Ashley* v. *Pease*, 18 Pick. 268, 275; *Palmer* v. *Evangelical Baptist Benevolent & Missionary Society*, 166 Mass. 143; and that what is retained by the grantor shall be construed so as not to be repugnant to the grant. *Pynchon* v. *Stearns*, 11 Met. 304, 312. *Dexter* v. *Manley*, 4 Cush. 14, 25. *Corbin* v. *Healy*, 20 Pick. 514.

The plaintiff's own witness, Stephen Salisbury, Jr., testified without objection that "cutting ice [was] always an incident to the use of the water for manufacturing purposes." The conclusion reached by the court is directly in the teeth of this evidence, which was admitted by both parties without objection and thereby became evidence in the case, although had it not been for that it would have been incompetent. *Damon* v. *Carrol*, 163 Mass. 404. *Boyle* v. *Columbian Fire Proofing Co.* 182 Mass. 93, 99.

Whether in this case there was a right to turn hot water into the pond is a question which, in the absence of the evidence offered, is not ripe for decision.

But in my opinion there is a fatal objection to the maintenance of this action by the plaintiff in any event, and that objection is that the plaintiff had no right to cut ice, but was a mere licensee.

I understand that in the case at bar it is conceded that the plaintiff corporation did not become tenant at will of the land under the pond, but that the land under the pond during the term of the lease to the Washburn and Moen Company, dated January, 1890, was either the land of Mr. Salisbury or the land of the defendant, who had succeeded to the estate of the lessee under that lease. I also understand it to be conceded that no right of property in the cutting of ice in water flowing this land which at the time was, as I have said, the land either of Mr. Salisbury or of the defendant, vested in the plaintiff corporation by virtue of the parol agreement between it and Mr. Salisbury *proprio vigore*, and that this is so because the right to cut ice under these circumstances is an incorporeal right in the land of some one other than the plaintiff, and this agreement was not under seal. And I further understand that the plaintiff's right to cut ice is made out on the ground that that right had become appurtenant to the land (of which the plaintiff became tenant at will under an oral agreement) and passed to the plaintiff as appurtenant to that parcel of land. I understand further that the way in which it is made out that this right to cut ice had become appurtenant to this parcel of land, of which the plaintiff was a tenant at will, was because it was made appurtenant to it in the lease of 1878, which finally expired in 1886, and because since then the practice of cutting ice on the pond in connection with the parcel of land of which the plaintiff was the tenant at will has *de facto* continued without a break.

The right to cut ice created by the lease to B. Walker dated October, 1878, terminated on the final expiration of that lease in 1886, and the proposition is this : If A. owns an ice house and the land under it, and also a pond, and for a great number of years ice has been in fact cut on the pond to fill the ice house, and A. lets the ice house and the land under it by word of mouth,

a right to cut ice on land which under the lease continues to be the land of the lessor passes to the tenant at will as appurtenant to the land.   From that proposition, I must dissent.   The right to cut ice is not appurtenant to the land on which the ice house stands, in the case put above and in the case at bar, because during all the years in question both have been owned by the same person and occupied by him or by his tenants.   What is meant by a right passing as appurtenant to a parcel of land which is demised is that an incorporeal easement or right in the land of a third person has been granted to the owner of the land demised as appurtenant to that land, and that this right in land of a third person passes to the tenant as appurtenant to the land demised; but where both the parcel of land demised and the parcel of land subject to the right in question — that is to say, both the dominant and servient estates — are owned by the same person, there can be no right in the one parcel appurtenant to the other parcel, however they have been used in fact and no matter how long that use may have continued.   In other words, the continued use of what would be an incorporeal right, were the two parcels owned by different persons, however long continued, does not bring into being a right over one parcel appurtenant to the other parcel.   It has been held in England since the time of Elizabeth to the present day that where the dominant and servient tenements have come into the ownership of one person an old servitude to which one of those tenements previously has been subject and which is then appurtenant to the other tenement is extinguished by the unity of ownership and is not continued by a *de facto* continuance of the old use, and consequently that it does not pass by a conveyance of what was formerly the dominant estate with appurtenances thereto belonging.   *Saundeys* v. *Oliff*, Moore, 467.   *Grymes* v. *Peacock*, Buls. 17.   *Whalley* v. *Tompson*, 1 B. & P. 371.   *Clements* v. *Lambert*, 1 Taunt. 205.   *Barlow* v. *Rhodes*, 1 Cr. & M. 439. *Plant* v. *James*, 5 B. & Ad. 791.

If a *de facto* use in one parcel of land in connection with another parcel of land, when both are owned by the same person, makes the use of the first parcel appurtenant to the second parcel, the right in question in each of the above cases would have passed under the conveyances with " appurtenances."   Take for

example the case of *Plant* v. *James.*  There a way from the highway had in fact always been used to and from a parcel of land called Park Hall over a parcel of land called Woodseaves. Park Hall was owned by two persons in common and Woodseaves, the land over which this way was laid, also was owned by the same tenants in common.  A partition was made by deed, Park Hall was conveyed to the defendant with appurtenances, and Woodseaves was conveyed to the other tenant; it was held that no right of way over Woodseaves passed to the grantee of Park Hall.  To pass a right which is *de facto* in use but which does not exist *de jure*, the grant must contain words which will revive or recreate an easement of the same kind as that which formerly existed and had been extinguished by the unity of ownership, and words equivalent to these are sufficient for that purpose: " together with all rights commonly used or enjoyed with the granted premises."  See *Bayley* v. *Great Western Railway,* 26 Ch. D. 434, and cases there cited.

It follows that in the case at bar, there being nothing more than a parol agreement, the plaintiff had no right to cut ice ; it was nothing more than a licensee.

It also is plain that a licensee, even while his license is unrevoked, has no right of action if the property upon which he has a license is injured or destroyed by a stranger.

A license gives no right to the property in respect of which the license is given; it goes no further than to excuse what would otherwise be a trespass.  So long ago as 1673 it was laid down by Chief Justice Vaughan in the Exchequer Chamber that " a dispensation or license properly passeth no interest, nor alters or transfers property in anything, but only makes an action lawful, which without it had been unlawful."  *Thomas* v. *Sorrell,* Vaughan, 330, 351.  And this has been cited with approval in England in *Muskett* v. *Hill,* 5 Bing. N. C. 694, 707, and in *Heap* v. *Hartley,* 42 Ch. D. 461, 468.  The same has been laid down in this Commonwealth in *Clapp* v. *Boston,* 133 Mass. 367.  In that case, the petitioner had placed an hydraulic ram in a well dug by him on land of one Lewis, by Lewis' license.  The respondent in taking a water supply under St. 1872, c. 177, took some of the petitioner's land and " lawfully flowed the land of Lewis where the ram and well were, so that the ram would not

work, and the petitioner was thereby deprived of the use of the water at his house and barn." It was held that the petitioner could have no compensation for this loss, not on the ground that his license was revocable and had been revoked by the respondent, but on the ground that the license from Lewis " gave the petitioner no estate or right in the land. It was a permission by the owner, which excused acts done under it which without it would be unlawful." Where A. owns a parcel of land covered with water and gives B. a license to cut ice on the water, the land and the ice forming on the water continue to be A's, and if any injury is done to either it is an injury suffered by A. on his property and he alone can sue for it. All that B. has is a dispensation which excuses him from being a trespasser if he cuts ice on A's land. He has no right of property in the ice and therefore has no standing in court to complain that it is injured. The cases of *Balcom* v. *McQuesten,* 65 N. H. 81, and *Ottawa Gas-Light & Coke Co.* v. *Thompson,* 39 Ill. 598, are direct authorities to the effect that a licensee, even while his license is unrevoked, has no right of action for injury to the property in question; and to the same effect see *Holford* v. *Bailey,* 13 Q. B. 426, 446; *Clark* v. *Close,* 43 Iowa, 92.

It may seem hard that the plaintiff who has secured a right to cut ice so far as an oral contract founded on a valuable consideration could give it, and who has gone to the expense of preparing to cut the ice, should have no remedy for the destruction of the ice by the defendant turning hot water into the pond which, for the purposes of this discussion, I assume it had no right to do. But the hardship is of the plaintiff's own making. It is a rule of the common law that no incorporeal right in the land of another can be acquired without a grant under seal. In the case at bar the plaintiff has been at expense without securing a grant under seal. It is no more a hardship to apply the elementary rule of law that a grant under seal is necessary to pass an incorporeal right than it would be to hold that a grantee under a conveyance of land made by word of mouth and without more gets no title, although he has paid for the land. The real question of hardship is this: Is it wise to require a seal to make a valid grant of an incorporeal right in land which remains the grantor's? I myself think that it would be unwise to allow

a valid grant of such a right to be made by word of mouth. Whether wise or not, the requirement of a seal is the rule of the common law, and until altered by the Legislature must be enforced by the courts.

My view of this case is this : The land under Salisbury Pond became the land of the lessee by virtue of the lease dated January, 1890, during the term thereby created, although the lessee was restricted in the use it could make of the water flowing over the land and of the land itself. The lessor, during the term of this lease, had an easement in gross in the land under the pond (which during the continuance of the lease was the land of the defendant) to cut ice on the pond, and this easement did not pass to the plaintiff because the agreement between the plaintiff and Mr. Salisbury was by word of mouth, and an easement can no more be transferred than it can be created, even for a term of years, except by a grant under seal. *Duke of Somerset* v. *Fogwell*, 5 B. & C. 875. *Mayfield* v. *Robinson*, 7 Q. B. 486, see pp. 489 and 490. *Wood* v. *Leadbitter*, 13 M. & W. 838, 842, 843. See also *Bird* v. *Great Eastern Railway*, 19 C. B. (N. S.) 268, 286 ; *Bird* v. *Higginson*, 2 A. & E. 696 ; *Roffey* v. *Henderson*, 17 Q. B. 574; Taylor, Ev. (9th ed.) §§ 973, 974; Hall, Profits à Prendre, 36–38 ; Goddard, Easements, 359. A valid contract, even one based on a valid consideration, does not convey a right of property in an easement ; all that it does is to give a right of action against the other party to the contract in case he fails to perform his obligation under the contract, as was laid down in *McCrea* v. *Marsh*, 12 Gray, 211, 213, and was subsequently held in *Kerrison* v. *Smith*, [1897] 2 Q. B. 445. Therefore, it is of no consequence whether this contract is or is not within the statute of frauds, as to which see *Cole* v. *Hadley*, 162 Mass. 579 ; *McManus* v. *Cooke*, 35 Ch. D. 681 ; *Webber* v. *Lee*, 9 Q. B. D. 315 ; *Duke of Sutherland* v. *Heathcote*, [1892] 1 Ch. 475 ; *Ferrell* v. *Terrell*, 1 Baxt. (Tenn.) 329. Whatever may be the rights of the plaintiff against Mr. Salisbury in contract, the ice was Mr. Salisbury's ice, and for an injury to it no one but the owner, Mr. Salisbury, can sue.

For these reasons, I think that the exceptions should be sustained. Mr. Justice HAMMOND and Mr. Justice BRALEY authorize me to state that they concur in this dissent.