## HOLYOKE WATER POWER CO. v. AMERICAN WRITING PAPER CO., Inc.
### No. 3220.

Circuit Court of Appeals, First Circuit.
June 1, 1937.

510

Samuel Williston, of Cambridge, Mass. (Bentley W. Warren, and Donald C. Starr, both of Boston, Mass., and Nathan P. Avery and James M. Healy, both of Holyoke, Mass., on the brief), for appellant.

Claude R. Branch, of Boston, Mass. (Charles P. Curtis, Jr., and Charles Ryan, both of Boston, Mass., and Russell L. Dav-enport, of Holyoke, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

MORTON, Circuit Judge.

This is a bill to enjoin the unpermitted use of water by the defendant. The case was referred to a master who reported in favor of the defendant, stating the facts on which he based his decisive findings. In the District Court his report was confirmed and a decree was entered dismissing the bill. The plaintiff has appealed.

The plaintiff owns a tract of land on which is a long-established water power development on the Connecticut river near Holyoke, Mass. It was built about 1850 and consists of a dam and three sets of canals, an upper level and a lower level. On these canals mill sites were sold on perpetual leases. See Holyoke Water Power Co. v. American Writing Paper Co., Inc., 57 S.Ct. 485, 81 L.Ed. ——, decided March 1, 1937. Many of these leases carried the right to a "mill power," which was described as a stated amount of water under a stated head, or the equivalent thereof. The mill sites on the upper canal discharged the water, after using it, into the lower canal, those on the lower canal into the river.

The defendant is the owner, through mesne conveyances, of a number of these mill sites and water powers, on which it has a paper manufacturing plant. It uses and has to use large amounts of processing water in manufacturing paper. The question is whether it has the right to do so. The defendant claims this right on three grounds: (1) That it was impliedly granted in the conveyances of mill sites and water powers to its predecessors in title, or that the power water might be so used; (2) that it has a prescriptive right to such use of the water; (3) that the plaintiff's bill is barred by laches and estoppel.

As to the implied grant, the master found that there was an implied grant, in connection with the original conveyances, of the right to use such water for processing and incidental purposes as the business conducted on each mill site might reasonably require. He has stated the facts on which he made this finding; and the plaintiff contends that they do not warrant it. The grants on which the defendant relies were made at various dates from 1855 to 1892. None of them was made to the defendant, which only recently succeeded to the prop-

erty. They were originally made to various persons and became consolidated in one ownership in the plaintiff or its immediate predecessor. The water company's grants were made on printed forms and sold or leased "a parcel of land to be described in the deed with one or more mill powers of the quantity of water described below." The mill powers were described as being "the right during the sixteen hours in a day, to draw from the nearest canal or water course of the grantor's, and through the land to be granted, 38 cubic feet of water per second at the upper fall, when the head and fall there is 20 feet—or, a quantity inversely proportionate to the height at the other falls." There are provisions adjusting the amount of water to different heights. Nothing whatever was said about processing water or incidental water. The indentures further provided that "the grantees are not to use more water than granted, nor waste it, nor permit it to be wasted for want of repairs, or through the deficiency of their works or otherwise; and if so wasted, or *if more be used than is granted* (italics supplied), the grantors may stop the water from entering the flues by closing the gates across them, or by any other method, until such waste or excessive use be sufficiently guarded against; and may also at the same time maintain their action at law for damages."

The master found that:

"The grants of mill sites contemplated the erection of mills thereon. For whatever form of manufacturing the mill so erected was to be used the requirement of a certain amount of water for non-power purposes would naturally be foreseen. (The finding contained in the foregoing sentence is not based upon any evidence introduced in the case, but solely upon what I regard as a matter of common knowledge.) In the case of a paper mill substantially more would be required than in most other forms of manufacture. These facts, and approximately the amount of non-power water that might reasonably be expected to be required by a paper mill in connection with the use of the mill powers granted, must have been known to the complainant and its predecessor at the time of the grants. Many of the grants of the mill sites were to paper companies in name. Thus the earliest grant of those here in question, made in 1855, was to the Parsons Paper Company; and the latest, in 1892, was to the Riverside Paper Company. As to some of the grants it would appear that the mill site was not used, or at any rate not used for paper manufacture, until a date considerably later than the grant; and as to these there is no evidence to show that the complainant had knowledge that the site was in fact going to be used for paper manufacture. The complainant, however, did have knowledge that the site would probably be used for some form of manufacture which would require some water for non-power purposes, and that it well might be used for paper manufacture, that being from the earliest times one of the principal, if not the principal industry carried on on the canals in Holyoke.

"That the respondent's predecessors in title must have understood at the time of the grants that they were entitled to draw from their flumes located on their mill sites such amount of water as might reasonably be required for manufacturing purposes in connection with the use of the mill powers, including paper manufacture, is, I think, clear, and I so find. * * *

"I find that the complainant also, and its predecessor, at the time of the grants of mill powers here in question intended that the grantees should in connection with the use of the mill powers granted have the right to take water from their flumes for manufacturing purposes. This finding is based upon the following considerations. The general situation above referred to was known to the complainant as well as to the grantees. And as before stated, although the use was at all times open and known to the complainant, there is no evidence to show that the complainant ever made any objection whatever, and I find that, prior to the bringing of this suit, the complainant never did anything to stop the use, or rendered any bills for or made any claims for compensation for the water so used. If the complainant had felt that the use was not rightful, it would certainly, I think, have required written evidence that the use was merely permissive, for as appears from the well agreements above referred to, a matter of far less importance to the complainant, it has been meticulous in protecting itself against the acquisition of rights by prescription. * * *

"The complainant argues that it ought not to be assumed that the complainant intended to give or that the grantees should have expected to get without compensation the substantial amounts of non-power water required by a paper mill. The answer to this is that at the time of the grants

512

there was an abundance of river water available for all purposes. It was not until about 1881 that the complainant even attempted to make any measurement for the purpose of checking on the amount used for power purposes. It was not until 1911 that the complainant attempted to make the sale of process water a source of revenue. Although the amount of process water required by a paper mill is large as compared with some things, it could not at the time of the grants have been regarded as of much moment in view of the amount of water available, in view of prices charged for power water, or in view of the amount of water involved in the grants of the mill powers. It appears that the amount of water used by the respondent for other use than power on its water wheels does not exceed more than two percent of the amount involved in the grants of mill powers which it holds; and if there be excluded the amount used in the so-called Barber suction devices, which, as hereinafter stated, I find to be used for power purposes, the percentage is only about one percent."

It will be observed that the master found, in addition to the express grant of the land and water power, an implied grant of whatever processing and incidental water might reasonably be required for the particular industry which might be established on the land sold. Large amounts of processing water were and are necessary in the manufacturing of paper. Some of the earlier grants were to paper companies. As to others of them, the purpose for which they would be used was not known when the grant was made.

■■■ Grants by implication are not favored by the law of Massachusetts, nor by the law generally. Nichols v. Luce, 24 Pick. (Mass.) 102, 35 Am.Dec. 302; Carbrey v. Willis, 7 Allen (Mass.) 364, 83 Am.Dec. 688. They arise out of the necessity of the situation, when granted property cannot be used without the right which is held to be conveyed. Pettingill v. Porter, 8 Allen (Mass.) 1, 85 Am.Dec. 671; Randall v. McLaughlin, 10 Allen (Mass.) 366.

■■■ That there was an implied grant of the right to use such incidental water as manufacturing establishments established on the sites sold would reasonably require, we see no reason to doubt. Such water would be absolutely necessary for any manufacturing use of the sites, and the amount of it would be unimportant, practically speaking. But the defendant's contention goes much farther and reads into the deeds to its predecessors, grants of whatever processing water might be reasonably required by any industry which might be or become established on a site. We are aware of no precedent which carries the doctrine of implied grants nearly so far. It is easily conceivable that the amount of processing water required by a particular industry might be very substantial. In the present case, the defendant claims the right to more than 1,500 million cubic feet per year. Grants are extended by implication only to what is necessary to any reasonable use of the granted property. They do not extend to what may be necessary for a particular use of it. Walker Ice Co. v. American Steel & Wire Co., 185 Mass. 463, 471, 70 N.E. 937. On the facts stated by the master, we are of the opinion that, while there was a grant by implication of the right to use incidental water required in manufacturing plants, there was no implied grant of processing water. By incidental water we mean water for drinking, for toilets, and other similar necessities in any kind of a manufacturing plant where people work.

■■ The defendant's next contention is that it has the right to use in processing the water granted for power purposes. This is a reasonable view which does no violence to the general character of the grants. The difficulty with it is that the Supreme Court of Massachusetts in Holyoke Water Power Co. v. Whiting & Co., Inc., 276 Mass. 528, 177 N.E. 568, said that water granted for power could not be diverted to other uses. We are bound by that decision, but we do not think it is controlling. The case came up on demurrer to the bill; there were no findings of fact. The bill alleged that "By well-known and long-established custom in the granting or leasing of water power, the mill powers granted are to be used for mechanical purposes for the production of power by the operation of water wheels and for no other purpose, and the water needed to develop mill powers cannot be used for manufacturing processes, feed water or steam condensing purposes, for filtration or for other purposes." 276 Mass. 528, 532, 177 N.E. 568, 570. There are no such findings in the present case; and other facts found by the master are inconsistent with some of the allegations on which the Whiting Case was decided. The term "mill power" used in this connection appears not to be common in this part of the country and to have had no clearly established meaning,

at the time when it was used in the grants, which would exclude the use of such water for processing purposes, and the master so found. In several of the grants by the plaintiff, the mill powers are referred to as a "quantity of water." While the indentures show a clear intention to restrict the *quantity* of water taken to that granted, there is nowhere any provision restricting the *use* of the granted water. If processing water were returned to the canal in reasonably pure condition, it would be of no concern to the plaintiff whether it was used for power or for processing. The Supreme Judicial Court seems to have erroneously assumed that processing water was lost. 276 Mass. 528, 538, 539, 177 N.E. 568. The considerations which the master relied on in finding an implied grant of processing water support this construction of the grants. If the amount of water granted could be used for processing purposes, the alleged necessity for implying the grant of a large and indefinite amount of additional water disappears. On the facts stated by the master we think the grants carried a right to use the specified amount of water for power or other industrial purposes.

▆▆ The defendant contends, as has been said, that if there was no implied grant of processing water, it has by many years user obtained a prescriptive right to it. On this point also the master found in favor of the defendant. The plaintiff contends that on the facts stated in his report his conclusion was clearly wrong. The question turns on whether the defendant's user was interrupted by notices given by the complainant to all lessees of its water power under Massachusetts Gen.Laws (Ter.Ed.) c. 187, §§ 3, 4. These notices were given in 1891, 1904 and 1918. Those given in 1891 and 1904 were in substance as follows:

"You are hereby notified that the Holyoke Water Power Company intends to prevent the acquisition by you of any right or easement to discharge any waste water or sewage into the Canals of this Company, from your premises, situated in said Holyoke * * * or to draw or take wash water or water for any purpose from the First Level Canal or any other Canal of the said Holyoke Water Power Company in excess of the rights, granted in and by the deed pany not granted in and by the deed aforesaid."

"It being the purpose of this notice to prevent the acquisition by you of any right or easement in, to or upon the canals of said

Company not granted in and by the deed aforesaid."
The notices given in 1918 were substantially similar.

The first question is whether the statute applies to such easements as are here claimed. The master ruled that it did. We reach the same conclusion. The statute says:

"Section 3. If a person apprehends that a right of way or other easement in or over his land may be acquired by custom, use or otherwise by any person or class of persons, he may give public notice of his intention to prevent the acquisition of such easement, by causing a copy of such notice * * * or he may prevent a particular person or persons from acquiring such easement by causing a copy of such notice to be served upon him or them as provided by law," etc.

By section 4:

"Section 4. A notice given under the preceding section shall be a disturbance of the easement."

The defendant claims a prescriptive right in the nature of an easement to take water from an artificial canal maintained by the plaintiff on its own land. This is an easement in the plaintiff's land within the meaning of the statute. North Side Canal Co. v. Twin Falls Canal Co. (D.C.) 12 F. (2d) 311; Adamson v. Black Rock Power Co. (C.C.A.) 297 F. 905, 912. If the water in the canal be regarded as something supplied from moment to moment by the plaintiff's industry, wrongful appropriation of it would not lay the foundation for prescriptive rights. West v. Giesen (Tex.Civ.App.) 242 S.W. 312.

▆ The master found that the notices given under the statute had not barred the easement because they were not sufficiently definite. We are wholly unable to agree. The notices were quite sufficient to call the recipients' attention to any unauthorized use of water in excess of the amount granted and to advise them that no prescriptive rights would be obtained by such unauthorized use. There is nothing in the statute nor in the reason of the thing which requires that each particular wrongful use should be pointed out to the person who is maintaining it. It follows that no prescriptive rights were established.

The master's error in regard to the sufficiency of the notices led him into a further one concerning estoppel. Regarding the notices as insufficient, he found that the plaintiff by its inaction and failure to ob-

ject to the use of water for processing purposes had misled the owners of the mill sites into thinking that such use of the water was permissible; and that in this belief created by the plaintiff persons had made large investments in manufacturing plants along the complainant's canals. The master found,

"If I am wrong in my finding as to the effect of the prescription notices above referred to, and if it be held that they were sufficient to notify a reasonable person that the complainant claimed that the owners of mill sites had no right to use any water whatever except for power on water wheels, then the (complainant) did give notice of its position as early as 1891, and I should then find that the complainant is not guilty of laches and is not stopped from maintaining this bill."

As we hold the notices sufficient, there was no estoppel.

The decree of the District Court is vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion; the appellant recovers costs of appeal.