LAMB KNITTING MACHINE COMPANY *vs.* CHICOPEE MANU-FACTURING COMPANY & another.

Hampden.  September 18, 1930. — December 18, 1930.

Present: RUGG, C.J., CROSBY, CARROLL, SANDERSON, & FIELD, JJ.

*Deed,* Construction. *Contract,* Construction. *Water Rights. Equity Jurisdiction,* Specific performance. *Equity Pleading and Practice,* Master: findings, exceptions to report, motion to recommit; Appeal; Decree.

Where the evidence upon which a master made findings stated in his report in a suit in equity is not reported, and the rule to the master did not require such a report, no abuse of discretion was shown in the denial of a motion to recommit the report and to order the master to report facts upon which he based some of his findings and to report certain further facts.

Exceptions to such a report, based upon the failure of the master to make certain specific findings or to report facts upon which the findings were made, or upon a contention that findings made were not supported by the evidence or that certain of the master's conclusions were immaterial, must be overruled.

On an appeal from a final decree in such a suit, the only question for decision was, whether the decree was warranted by the pleadings and the facts appearing in the record.

In the case of a grant by deed of real estate and easements, its terms can be enlarged by implication only if the implication is reasonable and necessary and not inconsistent with the terms of the grant.

The owner of land on the Chicopee River in 1822 conveyed by deed a portion thereof with the right which the grantor had to the use and

privilege of the stream and water of the river, excepting and reserving to himself, his heirs and assigns "the right of taking from the canal so much water as will pass through a gate or aperture of two feet in breadth and one foot in depth from the surface of the water, or a like quantity of water to be ascertained by calculation in case he shall elect to take the same at any other place than at the surface, said water to be taken against the land retained by the . . . [grantor], and at his expense, and for the sole use of a cupola and air furnace, and for no other use, and also the right of entering on the land hereby granted to fit a place for taking said water, and to lay a box or pipe or conductor, for the said water, and to repair the same at all reasonable times and in all reasonable ways"; and the grantor for himself, his heirs and assigns, covenanted with the grantee that there should not be erected on the land retained "any other buildings except an air and cupola furnace, a Blacksmith Shop, a Coal House and a Wood House, and that there shall not be erected thereon any lathe for the manufacture of machinery or turning or cutting iron." In 1835, successors in title to the grantor and a corporation which was a successor in title to the grantee made a deed in which, after reciting that buildings had been erected on the land retained by the former grantor in contravention of his covenant in the 1822 deed, the corporation released the other parties to the agreement from all claims for damages which had accrued for breach of the covenant and also released them from the covenant in the future in so far as to permit them to continue the present buildings and to erect upon the retained land "any buildings for Mechanic Shop that they may see fit, excepting such as may be deemed extra hazardous" and, in consideration thereof, the successors in title to the grantor granted to the corporation, its successors and assigns the right to build a dam across the river from the land retained by them to or towards the opposite side of the river, and the right to build a penstock, flume or canal of not more than a stated width across the land retained at a designated place, and the free and uninterrupted right to the use of all the water which might run in that canal; and the corporation also agreed to indemnify the successors in title to the grantor against any and all lawful claims for damages in consequence of the building of the dam or of the grant of the right to do so, and also engaged to secure the successors in title to the grantor from "any or all damages or hinderances to their use of the water to which they are entitled from the canal, and at all times to maintain and keep open a sufficient raceway or aperture under said pen-stock, flume or canal to carry off or convey said water to which they are entitled through the same into the river." *Held*, that the reference in the 1835 deed to the water to which successors of the grantor in the 1822 deed were entitled must be held to be no more than a confirmation of the then existing right to make use of the water.

In a suit in equity begun in 1908 by the successor in title to the grantor in the 1822 deed against the successors in title to the grantee therein, it appeared that predecessors of the parties in 1852 entered into an agreement with respect to the use of the water of the river which

provided that the arrangement therein made might be terminated by either party by giving the other six months' notice in writing, "in which case each party shall be remitted to their former rights"; that thereafter a penstock was installed by the plaintiff's predecessor in title which was larger than the one there before, and the parties operated under this agreement until it was terminated in 1906 by notice given by the defendants, and that the penstock still remained of the same size and in the same position, the bottom being slightly above the level of the bottom of the canal at the wall; that after the making of the deed of 1835 and in accordance therewith, the raceway required thereby was maintained by the defendants and discharged into the river, but after 1852 was discontinued, and the water used by the plaintiff's predecessor in title was discharged into the lower canal so called. A master found that there was no evidence which would lead him to conclude that the raceway was inadequate or inconvenient for the plaintiff's needs, or that the plaintiff had sustained or was likely to sustain damage if obliged to continue its use, or if the defendants were not compelled to construct a raceway as provided in the deed of 1835; that in 1906 the defendants offered to construct a sufficient raceway for the plaintiff, and made preparations accordingly, which were known to him, and in 1908 gave notice to the plaintiff that they were ready to restore the opening under the canal, but that the plaintiff had never taken any action or signified his attitude relative to this offer or notice. *Held*, that, assuming that the plaintiff had not abandoned his contract right to have such a raceway, on the facts the provision in the contract for the construction and maintenance of a raceway should not be specifically enforced by injunction in the suit.

In the suit above described, it further appeared that the defendants had built a cofferdam outside the aperture through which the water was taken by the plaintiff, but it did not appear that the plaintiff's right to the water was in any manner interfered with by this construction or that he was not receiving the water against the land retained when it was received through an adequate opening in the cofferdam. *Held*, that

(1) A contention by the plaintiff that he should not be required to take water through an opening in a cofferdam was without merit;

(2) Upon the findings, no order could be made fixing the height at which the plaintiff was entitled to receive his water from the canal.

In the suit above described, a final decree was entered which in paragraph one restrained and enjoined the defendants from preventing, hindering or obstructing the plaintiff from receiving for the uses and purposes permitted under paragraph three of the decree, but for no other purpose and at the sole expense of the plaintiff, such amount of water as would flow, under natural conditions and without forced draft or suction, through a gate or aperture in the defendants' cofferdam, or in the wall or side of the defendants' canal, two feet in width and one foot in depth from the surface of the water or a like quantity of water, to wit, a like number of cubic feet per second, through an aperture the size of which was to be ascertained by calculation in

case the plaintiff elected to take the water elsewhere than at the surface, and/or under any manner of forced draft or suction; provided that nothing in the decree should be deemed to prevent the defendants from drawing down the water in the canal for the purpose of making inspection or repairs or for any other reasonable and proper purpose in connection with the maintenance of the canal; that the defendants were not obliged to restore or maintain any raceway or aperture under the other or lower canal; and in paragraph three the plaintiff was permanently restrained and enjoined from diverting any greater amount or quantity of water from the canal of the defendants than was permitted under paragraph one of the decree, or from diverting any water from the canal for any purpose other than the operation of a cupola and air furnace or foundry, including the incidental work of finishing, cleaning and smoothing castings produced thereby, except with the consent and permission of the defendants. *Held,* that

(1) The words used in the first paragraph of the decree to define the plaintiff's rights in case he elected to take water elsewhere than at the surface should be in the terms of the agreement and should omit the additional words relating to forced draft or suction;

(2) A provision should be in the decree protecting the defendants in their right to draw the water down in the canal for the purpose of making inspection or repairs, but the plaintiff was entitled to have inserted a limitation to the effect that this should be done at reasonable times and in reasonable ways;

(3) Otherwise the decree was proper.

BILL IN EQUITY, filed in the Superior Court on September 9, 1908, described in the opinion.

The defendant filed a cross bill.

The suit was referred to a master. Material facts found by the master are stated in the opinion. The plaintiff's objections to and motion to recommit the master's report are described in the opinion.

The suit was heard by *Greenhalge,* J., by whose order the interlocutory decree and the final decree described in the opinion were entered. The plaintiff appealed.

*J. P. Kirby,* for the plaintiff.

*B. E. Eames,* for the defendants.

SANDERSON, J. In this case the plaintiff has appealed from an interlocutory decree denying its motion to recommit the master's report, overruling exceptions thereto, and allowing the defendant's motion to confirm the report, and from a final decree. The bill was brought to restrain the defendant from preventing, hindering or obstructing

the plaintiff in using the full quantity of water to which it claims to be entitled during twenty-four hours of each day and from further refusing or neglecting to provide, maintain and keep open a raceway or aperture under a canal.

The master appointed found that the plaintiff has conducted upon its premises the business of manufacturing continuously since its organization in 1900, using water power alone for a short time, then installing steam, and thereafter operating by means of both kinds of power. The water is obtained from a canal owned and operated by the defendant and flows from this canal through a penstock of the plaintiff in which is a wheel whereby the power used is generated. The original defendant, the Chicopee Manufacturing Company, carried on a manufacturing business and for power used water conducted through a canal from the Chicopee River. In 1922 Chicopee Manufacturing Corporation, to which the original defendant had transferred its property and business, was added as a party defendant. It has carried on a business similar to that of its predecessor and used water from the canal in the same way. The original defendant will be referred to as the defendant unless otherwise indicated. The property upon which the mill of the plaintiff stands has been used for more than a hundred years for various kinds of manufacturing, but producing principally agricultural machinery and implements.

The first indenture with reference to the water rights in question was made in 1822. In it Benjamin Belcher conveyed to Jonathan Dwight certain tracts of land with the right which the grantor had to the use and privilege of the stream and water of the Chicopee River, excepting and reserving to himself, his heirs and assigns " the right of taking from the canal so much water as will pass through a gate or aperture of two feet in breadth and one foot in depth from the surface of the water, or a like quantity of water to be ascertained by calculation in case he shall elect to take the same at any other place than at the surface, said water to be taken against the land re-

tained by the said Benjamin, and at his expense, and for the sole use of a cupola and air furnace, and for no other use, and also the right of entering on the land hereby granted to fit a place for taking said water, and to lay a box or pipe or conductor, for the said water, and to repair the same at all reasonable times and in all reasonable ways." The grantor for himself, his heirs and assigns, covenanted with the grantee that there should not be erected on the land retained " any other buildings except an air and cupola furnace, a Blacksmith Shop, a Coal House and a Wood House, and that there shall not be erected thereon any lathe for the manufacture of machinery or turning or cutting iron." The master found that the inference seemed warranted that, both before and after this deed was made, power was generated from the plant of Belcher by water passing through a fixed gate or aperture such as is described in the indenture and located at the surface of the water. Accordingly he concluded that the right relative thereto mentioned in the indenture was an exception rather than a reservation. The plaintiff is the successor in title of Belcher and to his rights and obligations in so far as not changed by later agreements or conduct. The Chicopee Manufacturing Corporation is the successor in title to Dwight, named in the indenture, in so far as its rights are not affected by subsequent agreements or conduct.

The indenture of 1822 was modified by one made in 1835 between the defendant, successor in title to Dwight, and Benjamin B., John W. and Bildad B. Belcher, successors in title to Benjamin Belcher, in which, after reciting that buildings had been erected on the land retained by Belcher in contravention of his covenant in the 1822 indenture, the defendant released the other parties to the agreement from all claims for damages which had accrued for breach of the covenant and also released them from the covenant in the future in so far as to permit them to continue the present buildings and to erect upon the retained land " any buildings for Mechanic Shop that they may see fit, excepting such as may be deemed extra

hazardous and that they will in no way hinder them in so doing." In consideration of this agreement on the part of the defendant the Belchers granted to it, its successors and assigns a right to build a dam across the Chicopee River from the land retained by them to or towards the opposite side of the river; also, the right to build a penstock, flume or canal of not more than a stated width across the land retained at a designated place; and the free and uninterrupted right to the use of all the water which may run in that canal. And the defendant also agreed to indemnify the Belchers against any and all lawful claims for damages in consequence of the building of the dam or of the grant of the right to do so. The defendant in this indenture also engaged to secure the Belchers from " any or all damages or hinderances to their use of the water to which they are entitled from the canal, and at all times to maintain and keep open a sufficient raceway or aperture under said pen-stock, flume or canal to carry off or convey said water to which they are entitled through the same into the river."

In 1852 the defendant and John W. Belcher entered into an agreement in which the former consented and agreed that Belcher might substitute a new penstock three feet in diameter in place of that by which water was then drawn from the canal, for the use of " the works at said Belcher's furnace," having the gate thereof so constructed as to regulate or limit the quantity of water to be drawn through the same according to the provisions therein contained. The defendant consented that Belcher and those enjoying his rights in the premises might draw water from the canal for the use of " said works " exceeding the quantity he was then entitled to draw according to the reservations and limitations in the indentures of 1822 and 1835 to the extent of the capacity of the penstock three feet in diameter, during the portions of the year when there was a surplus of water beyond what might be required for the operations of the defendant and a designated paper mill. Belcher agreed to limit the quantity which he and those occupying the premises would draw

from the canal by means of the penstock to the quantity to which he had theretofore been entitled, except when there should be such surplus of water and, under certain specified conditions, in case of a deficiency that he would discontinue the use of the water so long as such deficiency should last. He also agreed so to change his raceway that the water used at his works would be discharged into the canal and that he would close up and discontinue his present waste course. It was also therein agreed that either party might terminate the arrangement by giving to the other six months' notice in writing of the intention so to do, " in which case each party shall be remitted to their former rights." The height of the original dam has been increased several times since 1822, and its location and construction have been altered. Since 1915 the average level of the water in the canal has been approximately twenty inches higher than before that year.

The master found that the words " mechanic shop " in the agreement of 1835 are synonymous with machine shop; that a cupola or air furnace is a chimney for melting iron for the purpose of making it into castings and is a part of a foundry, and that during the entire period from 1822 there has been a cupola or air furnace operated on the premises now owned by the plaintiff which has been used in connection with the manufacturing businesses carried on; that water power has always been employed in connection with the operation of this contrivance, and also, independently of the cupola, for operating machinery to finish the castings; that the cupola or air furnace was used on the average only about three hours continually each day, seldom if ever more than six, but there were grindstones, snagging machines and tumbling barrels which finished or smoothed the castings and which were run by water power mornings, at which time the cupola was not in operation. The plaintiff and its predecessors in title have made use of this water power as they have had occasion to do so during the ordinary daylight hours between seven and six and occasionally at other times. Shortly before this suit was brought the defendant placed

in its canal a cofferdam, in the form of a v-shaped contrivance extending from the bank about fifteen feet into the canal and so constructed as to allow the water for the plaintiff's use to pass through it. As originally built in the summer of 1907, an opening was cut in it two feet wide, extending about four feet down from the top of the structure, with a gate which could be raised and lowered so that its upper edge could be kept one foot below the surface of the water. The gate obstructed the opening below that point, and a flow of water was supplied two feet wide and one foot deep over the gate. The defendant placed a man at this point with instructions to raise and lower the gate so that the plaintiff would always have the required amount of water. Later a new opening was cut in the cofferdam measuring two feet vertically and one foot horizontally, with its lower edge near the bottom of the cofferdam and about one foot from the bottom of the canal. This lower aperture also had a gate, and whenever the water went down so far that the upper opening would not furnish the required amount of flow, the defendant could open the lower aperture. This change in construction was made shortly after the defendant learned that at times the requisite amount of water was not supplied. In 1909 under a prayer in a cross bill filed in the case an injunction was issued restraining the plaintiff from hindering or obstructing the defendant in the use and regulation of the waters of the canal, or in the operation of the defendant's dam and gates. This injunction was still in force when the master's report was filed.

The master found that the evidence seemed to warrant the conclusion that when the proceedings were instituted, and for some time previous thereto, the plaintiff at intervals was not receiving the amount of water which would flow through an opening two feet horizontally and one foot vertically at the surface of the canal, first, because of the construction of this cofferdam and the location of the original or upper opening therein and the failure of the attendant properly to adjust the gate, and, thereafter, because of the failure of the attendant at times to open

the lower gate when the water went down below the upper opening. He found however that since the change in the water gate was made, except during infrequent periods of low water due to insufficient rainfall, the quantity of water received by the plaintiff from the canal has been substantially more than was required by the indenture of 1822. After the agreement of 1852 was entered into, a penstock was installed by the plaintiff's predecessor in title which was larger than the one there before, and the parties operated under this agreement until it was terminated in 1906 by notice given by the defendant. The penstock still remains the same size and in the same position, the bottom being slightly above the level of the bottom of the canal at the wall. After the making of the indenture of 1835 and in accordance therewith, the raceway required thereby was maintained by the defendant and discharged into the river. In conformity with the provisions relative thereto contained in the agreement of 1852, this raceway was discontinued, and the water used by the successors in title to Belcher was discharged into the lower canal so called. The master concluded from this circumstance that it was not the intention of the parties to this agreement that the right to have the raceway discharge into the lower canal should be revived by virtue of the notice to terminate the agreement, and that the defendant was not obligated thereafter to maintain and keep open for the plaintiff's predecessors the raceway or aperture referred to in the indenture of 1835. He found that the raceway in use by the plaintiff and discharging into the lower canal has been in operation for a long time, and that there was no evidence which would lead him to conclude that it is inadequate or inconvenient for the plaintiff's needs, or that the plaintiff has sustained or is likely to sustain damage if obliged to continue its use, or if the defendant is not compelled to construct a raceway as provided in the indenture of 1835. In 1906 the defendant offered to construct a sufficient raceway for the plaintiff, and made preparations accordingly, which were known to it, and in 1908 gave notice to

the plaintiff that it was ready to restore the opening under the canal, but the plaintiff has never taken any action or signified its attitude relative to this offer or notice. An interlocutory decree was entered denying the plaintiff's motion to recommit the report, overruling the plaintiff's exceptions thereto, and confirming the report.

The final decree in paragraph one restrained and enjoined the defendant from preventing, hindering or obstructing the plaintiff from receiving for the uses and purposes permitted under paragraph three of the decree, but for no other purpose and at the sole expense of the plaintiff, such amount of water as will flow, under natural conditions and without forced draft or suction, through a gate or aperture in the defendant's cofferdam, or in the wall or side of the defendant's canal, two feet in width and one foot in depth from the surface of the water or a like quantity of water, to wit, a like number of cubic feet per second, through an aperture the size of which is to be ascertained by calculation in case the plaintiff elects to take the water elsewhere than at the surface, and/or under any manner of forced draft or suction; provided that nothing in the decree should be deemed to prevent the defendant from drawing down the water in the canal for the purpose of making inspection or repairs or for any other reasonable and proper purpose in connection with the maintenance of the canal. It was also ordered in the decree that the defendant is not obliged to restore or maintain any raceway or aperture under the other or lower canal, and in paragraph three the plaintiff, its officers, agents and servants, were permanently restrained and enjoined from diverting any greater amount or quantity of water from the canal of the defendant than is permitted under paragraph one of the decree, or from diverting any water from the canal for any purpose other than the operation of a cupola and air furnace or foundry, including the incidental work of finishing, cleaning and smoothing the castings produced thereby, except with the consent and permission of the defendant.

In the plaintiff's motion to recommit the report it sought

to have the master ordered to report facts upon which he based some of his findings and to report further facts concerning the head and fall and the level of the water in the canal. In the denial of this motion we find no abuse of discretion. *Greek Orthodox Community* v. *Malicourtis,* 267 Mass. 472, 479. The evidence is not reported and the exceptions based upon the failure of the master to make certain specific findings or to report facts upon which the findings were made, or upon the contention that findings made are not supported by the evidence or that certain of the master's conclusions were immaterial, must be overruled. *Wilde* v. *Sawtelle,* 232 Mass. 117, 121. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 334. *Harvey* v. *Crooker,* 267 Mass. 279, 281. *American Agricultural Chemical Co.* v. *Robertson, ante,* 66. Under the rule to the master he was not required to make rulings of law. *Dittemore* v. *Dickey,* 249 Mass. 95, 112. On the appeal from the final decree the only question for decision is whether the decree is warranted by the pleadings and the facts appearing in the record. *Watertown* v. *Dana,* 255 Mass. 67, 72. *Wood* v. *Baldwin,* 259 Mass. 499, 514.

The size of the opening and the use to which the water coming through it could be put are clearly defined in the deed and indenture of 1822. The plaintiff contends that the use as therein limited was enlarged by the indenture of 1835. In this agreement there was no grant of land or of buildings. In so far as buildings were concerned it was a release from claims for damages for breach of covenants as to their erection, accompanied by the permission to erect buildings for a machine shop. In the case of a grant, its terms can be enlarged by implication only if the implication is reasonable and necessary and not inconsistent with the terms. *Allen* v. *Scott,* 21 Pick. 25, 29. *Hurd* v. *Curtis,* 7 Met. 94, 112–113. *Parker* v. *Bennett,* 11 Allen, 388, 392. It is reasonable to suppose that if the use of the water which was strictly limited in the agreement of 1822 was intended to be enlarged by the agreement of 1835 such intention would be clearly expressed. It does not appear from the facts found that

the use of water power was reasonably necessary either in the buildings which by the terms of the 1835 agreement were permitted to remain on the land or in those to be built thereafter.   In a recital near the beginning of the 1835 agreement reference is made to the conveyance of land by the 1822 indenture, " together with certain water privileges on said river and rights therein excepting a right to take a certain quantity of water against the land retained by said Benjamin [Belcher] for the sole use of a cupola and air furnace."   This recital is to be considered in determining the significance of the only other reference in that indenture to the right of the plaintiff's predecessors to take water, namely, that wherein the defendant engaged to secure the plaintiff's predecessors in title " from any or all damages or hinderances to their use of the water to which they are entitled from the canal."

The words " to which they are entitled " seem to refer to the whole expression " their use of the water " and do not indicate an intention to enlarge the Belchers' rights. Following the engagement not to interfere with the Belchers in their use of the water, and as a part of the same sentence, is the agreement of the defendant to maintain and keep open a sufficient raceway under the penstock, flume or canal to carry off or convey the water to which they are entitled through the same into the river.   Both of these references to the water to which the Belchers were entitled naturally refer to the water rights fixed by the 1822 agreement.   These provisions would seem to indicate that the parties may have had hindrances in the matter of receiving the water to which they were entitled as well as in having a sufficient raceway kept open disposing of it, but whether this is so or not the agreement assures the Belchers that no troubles of that kind will occur in the future.   There is no finding in the report that the plaintiff or its predecessors in title during the years between 1835 and 1852 made use of the water for any purpose other than operating the cupola or air furnace or foundry including the incidental work of finishing, cleaning and smoothing the castings produced thereby.

If the right granted in the 1852 agreement enlarged the use which might be made of water under the 1822 agreement, this larger right ceased when that agreement came to an end in 1906. If it be assumed that after the agreement of 1835 more water was used at the plant on the plaintiff's premises than was permitted by the 1822 indenture, the rights of the parties are so fixed by the terms of the instruments themselves that upon the facts found such use could not be held to enlarge the rights granted in the indenture of 1822. The consideration for the grant of the right to build a dam is expressly stated to be the release of the other parties from damages for breach of covenant in the 1822 agreement as to erection of buildings and the partial release from that covenant in the future. Nothing is therein said about any enlargement of the right to use water, and the covenant in the 1822 agreement as to erecting buildings on the retained land remains in full force except as specifically modified by the provisions of the second agreement. The reference to a mechanic shop, interpreted to mean machine shop, may well have meant a shop where mechanics work without the use of power. Or it may be that the machine shop was to be used for the incidental work or finishing operations on the castings after they came from the cupola, for which water power had been used, and that any machinery for that purpose requiring power was to be in this shop. When all of the terms of the agreements are considered, the reference in the 1835 indenture to the water to which the plaintiff's predecessors were entitled must be held to be no more than a confirmation of the existing right to make use of the water.

The plaintiff contends that the finding of the master as to the raceway is erroneous in that it ignores the water power producing value of a raceway under the canal. We cannot say from the facts reported that the master's conclusion is wrong, and we are bound by his finding on this issue. It does not appear from the findings whether or not the defendant now owns the location of the lower raceway or that an action at law would not be an adequate remedy

if the plaintiff could prove damages. Assuming that the plaintiff has not abandoned his contract right to have such a raceway, we are of opinion that on the facts the provision in the contract for the construction and maintenance of a raceway should not be specifically enforced. Upon the record no order concerning the level at which the water in the canal should be maintained was required.

The plaintiff contends that under the 1822 indenture its right was to take water " against the land retained," and that it should not be required to take it through an opening in a cofferdam; but the cofferdam extended from the land retained, and it does not appear that the plaintiff's right to the water is in any manner interfered with by this construction or that it is not receiving the water against the land retained when it is received through an adequate opening in the cofferdam. All questions raised by the interlocutory decree denying the plaintiff's motion to recommit the master's report, overruling its exceptions and confirming the report have been considered and no reversible error is disclosed. Upon the findings no order can be made fixing the height at which the plaintiff is entitled to receive its water from the canal.

The plaintiff objects to the final decree because of its use of the words " as will flow, under natural conditions and without forced draft or suction," in describing the water to which it is entitled, through an aperture " two feet in width and one foot in depth," and also of the words " and or under any manner of forced draft or suction " in referring to the right of the plaintiff in case it elects to take water otherwise than through an aperture two feet by one foot at the surface of the canal. The agreement gave Belcher two choices: he might take the water at the surface through an aperture of the size described, or he might take a like quantity elsewhere, the amount to be ascertained by calculation. We are of opinion that the words used in the first paragraph of the decree to define the plaintiff's rights in case it elects to take water elsewhere than at the surface should be in the terms of the agreement and should omit the additional

words relating to forced draft or suction. The pleadings do not seem to have raised an issue as to the method of ascertainment by calculation of a like quantity of water if taken elsewhere than at the surface, and the findings do not justify an order in the decree concerning the matter.

It is not disputed that a provision should be in the decree protecting the defendant in its right to draw the water down in the canal for the purpose of making inspection or repairs, but the plaintiff is entitled to have inserted a limitation to the effect that this shall be done at reasonable times and in reasonable ways. The first paragraph of the decree is to be struck out and the following is to be substituted therefor: (1) That the defendant, Chicopee Manufacturing Corporation, its officers, agents and servants, be and they are hereby permanently restrained and enjoined from preventing, hindering or obstructing the plaintiff from receiving, for the uses and purposes permitted under paragraph (3) of this decree but for no other purpose, and at the sole expense of the plaintiff, such amount of water as will flow through a gate or aperture in the defendant's cofferdam, or in the wall or side of the defendant's canal, two feet in width and one foot in depth from the surface of the water or a like quantity of water, to wit, a like number of cubic feet per second, through an aperture the size of which is to be ascertained by calculation in case the plaintiff elects to take said water at any other place than at the surface; provided, however, that nothing in this decree shall be deemed to prevent the defendant, Chicopee Manufacturing Corporation, from drawing down the water in said canal at reasonable times and in reasonable ways for the purpose of making inspection or repairs, or for any other reasonable and proper purpose in connection with the maintenance of said canal.

The interlocutory decree is affirmed, and the final decree, except as paragraph one is herein modified, is affirmed with costs.

*Ordered accordingly.*