HOLYOKE WATER POWER COMPANY *vs.* WHITING AND
COMPANY INCORPORATED.

Hampden.   May 22, 1931. — September 10, 1931.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, & WAIT, JJ.

*Deed,* Construction.   *Custom.   Water Rights.   Equity Pleading and Practice,* Bill.   *Equity Jurisdiction,* To enjoin improper use of water rights. *Words,* "Mill-powers," "Power."

A corporation owning under Sts. 1848, c. 222; 1859, c. 6, a hydraulic system on the Connecticut River maintained a dam and conveyed the water thus impounded into a canal, whence it flowed through flumes and water wheels in mill sites on the canal and raceways into a second canal on a lower level, and thence in a similar manner into a third and lower canal or into the river.   The corporation sold mill sites on the canals with water rights therein.   Its long established practice was never to sell water rights except as appurtenant to some site.   It contracted to maintain the canals and, in connection therewith, it was obliged to take into account the "balancing of the canals." In 1854 it sold to a manufacturing company a tract of land with the buildings thereon on the uppermost canal, "with fifteen mill-powers . . . with all the privileges and appurtenances to the same belonging," a mill power being defined as "the right, during sixteen hours in a day, to draw from the . . . canal . . . and through the land to be granted" a certain amount of water.   It also agreed to convey further mill powers upon request if there were sufficient water.   In 1869, it made a similar conveyance to an individual of another tract of land with six and one half mill powers.   In 1882, in discharge of its obligations under the deed of 1854, it conveyed to the manufacturing company five day mill powers of surplus water.   By well known and long established custom, the mill powers granted were to be used for mechanical purposes for the production of power by the operation of water wheels and for no other purpose, and the period of use of the mill powers was from 6 A.M. to 10 P.M.   Subsequently, a second corporation acquired the mill sites conveyed to the manufacturing company and to the individual.   The second corporation was not a riparian proprietor as to either tract.   In a suit in equity by a successor in title of the water power corporation against the second corporation, it was *held,* that

(1) By the terms of the conveyances in 1854 and 1869, construed in the light of all the circumstances, the mill powers granted in each deed were appurtenant to the land granted in that deed;

(2) The grant of mill powers in 1882 was inseparably connected with the transaction in 1854 and must be construed in the light thereof, so that such mill powers also were appurtenant to the land conveyed in 1854;

(3) Notwithstanding the common ownership by the defendant of both tracts of land, it was not entitled to use the mill powers acquired by its predecessors in 1854, 1869 and 1882 interchangeably on both tracts to suit its convenience: the mill powers granted with each tract could be used only in connection with that tract;

(4) The defendant not being a riparian proprietor, the extent of its rightful use of the water under the mill powers must be determined by the grants;

(5) The grants, construed in the light of all the circumstances, meant that the grantees in the use of the water were limited to the driving of water wheels for the production of power; and the defendant had no right to use the water for manufacturing processes, feed water, steam condensing and filtration purposes;

(6) Even if the term "mill power" in the grants were of doubtful meaning, the same construction thereof would follow because of the meaning attached thereto by the long established custom and usage;

(7) Although the particular hours of the day on which the defendant was entitled to use its mill powers were not specified in the grants, they were shown sufficiently by the long established custom and usage in that regard;

(8) The defendant was not entitled to use water, in addition to that required for its mill powers, for manufacturing processes, feed water, steam condensing and filtration purposes, by drawing it directly from the flume connected with the canal by means of a filtration basin and pipes so that it would not go through the water wheels of the defendant's mill, but would be consumed upon its premises;

(9) The plaintiff was entitled to relief in equity against the various improper uses of water by the defendant above described; the plaintiff was not deprived of its right to such relief by rights reserved in the grants of its predecessor to stop the water from entering the defendant's flume and also to maintain an action at law, since those remedies were not exclusive.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Hampden on October 19, 1928, and afterwards amended, described in the opinion.

The defendant demurred, and its demurrer subsequently was amended. The suit was reserved and reported by *Crosby,* J., for determination by the full court upon the amended bill and demurrer.

*P. N. Jones,* (*D. E. Hall* with him,) for the defendant.

*B. W. Warren,* (*N. P. Avery & H. Stockton, Jr.,* with him,) for the plaintiff.

RUGG, C.J. This suit relates to the respective rights of the parties in the use of the water and water power developed from the fall in the Connecticut River at Holyoke and

South Hadley. The case was reserved for our determination upon the bill and demurrer both as amended. The allegations in the bill in substance are these: The plaintiff under statutory authority is the owner of an hydraulic system consisting of a dam with connecting canals and locks constructed and adapted for creating and maintaining "a water-power" to be used by itself "for manufacturing and mechanical purposes, and to be sold or leased to other persons or corporations, to be used for like purposes." St. 1848, c. 222. St. 1859, c. 6. The plaintiff and its predecessor in title, the Hadley Falls Company, as a part of a general plan for developing a manufacturing community have sold parcels of land contiguous to the canals, for purposes of mill sites, with certain water power privileges appurtenant thereto. (Compare *Essex Co.* v. *Lawrence*, 214 Mass. 79.) The defendant is the successor in title of several of the grantees of such parcels. Alleged wrongful use or threatened wrongful use by the defendant of the water power privileges is the ground of the suit. No land has been sold or leased by the plaintiff or its predecessor except for a mill site and except with mill powers indentured as appurtenant thereto. A mill power is declared in the instruments of grant and indenture to be "the right, during sixteen hours in a day, to draw from the nearest canal or water course" of the plaintiff, "and through the land to be granted [the land to which such mill power is annexed], thirty-eight cubic feet of water per second at the upper fall, when the head and fall there is twenty feet — or a quantity inversely proportionate to the height at the other falls." No mill powers have been sold or leased except as appurtenant to some specified mill site on one of the canals or water courses. The hydraulic development of the plaintiff is this: On the Holyoke side of the river an intake canal receives water impounded by the dam and conveys it into another known as the first level canal. On this first level canal are numerous mill sites with mills to which mill powers have been granted as appurtenant for the purpose of furnishing water power to operate the mills. Water flows from the first level canal through flumes located on mill sites to which the water

has by indentures been made appurtenant, through water wheels connected with the flumes and thence through raceways into the second level canal. Along the second level canal also are mills on mill sites to which mill powers have been granted as appurtenant and the water in this canal flows through flumes, water wheels connected therewith and thence through raceways in some instances into the river and in other instances into the third level canal. Likewise, mills on mill sites on the third level canal utilize the water in the same manner and under similar conditions as mills on the first and second level canals. The mill powers are of these classes: (1) permanent mill powers sold for use in the first instance upon the first level canals which under ordinary conditions could be supplied with sufficient cubic feet of water per second during the usual period of low water flow; (2) nonpermanent mill powers calculated to include water power which the plaintiff contracts to furnish only when there is sufficient water in the canals over and above the amount needed for the permanent mill powers and also over and above the amount of water necessary to balance any lower level canals and also over and above a specified reserve of water power; (3) a grant to the defendant's predecessor in title, the Lyman Mills, of the right, now held by the defendant, to draw five day mill powers of surplus power, between the hours of 6 A.M. and 10 P.M. of each working day, under stated conditions; (4) indentured surplus water which can be used for manufacturing processes, feed water and steam condensing subject to specified conditions; (5) surplus water power available at certain periods of the year in excess of the other four classes which may be sold or not as deemed expedient by the plaintiff. The mill powers thus described are also classified according to the periods of the twenty-four-hour day in which they may be used. In the management of its hydraulic system the plaintiff is obliged to take into account the "balancing of the canals," so called, which involves supply by the plaintiff of water to lower level canals in addition to water discharged into such canals through the water wheels of owners on a higher level canal

in order to meet the requirements of owners of mill sites on such lower level canals. The customary method of measuring the amount of water taken by the respective grantees is by the gate opening of the wheels, and when water is taken by pipes or in any way other than through the wheels, the plaintiff is commonly unable to determine the amount of water taken. Prior to 1881 there was an excess of water available but since that year it has been necessary to restrict various grantees to the water required to produce the permanent mill powers actually granted to them. The defendant is the owner at the upper fall, that is, on the first level canal, of fifteen sixteen-hour permanent mill powers, as described in specified documents, as appurtenant to an identified parcel of land owned by it, and also of six and one half like mill powers appurtenant to another identified parcel owned by it. The defendant also owns five day mill powers of surplus water in accordance with an agreement with regulations of the plaintiff, which day mill powers are appurtenant to the first named parcel of land owned by the defendant. These various mill powers are appurtenant to the respective parcels of land with which they were granted, must be used upon and drawn through the land so conveyed, and the water is not to be consumed upon the premises or the quantity thereof diminished.

By well known and long established custom in the granting or leasing of water power, the mill powers granted are to be used for mechanical purposes for the production of power by the operation of water wheels and for no other purpose, and the water needed to develop mill powers cannot be used for manufacturing processes, feed water or steam condensing purposes, for filtration or for other purposes. The defendant is using or proposes to use its property, which it purchased from the Lyman Mills and which has heretofore been operated as a cotton textile manufactory, as a paper mill; it is using its several mill powers, not upon the parcels of land to which alone they are appurtenant but upon a parcel or parcels to which they are not appurtenant, and is using its mill powers not only for mechanical purposes in the operation of water wheels but

also for manufacturing processes, feed water, steam condensing and filtration purposes and is using water for such purposes from the plaintiff's canals and water courses in addition to that required to develop the mill powers.

The mill powers of the defendant are known as sixteen-hour mill powers, the period of use of which is, by well known and long established custom at and since the date of the grants of mill power, from 6 A.M. to 10 P.M. The defendant is using its mill powers at other than these hours and at disconnected periods. The defendant is constructing or has constructed a filtration basin to which pipes are being or have been laid so that the water obtained from the flume does not go through the water wheels of the mill of the defendant but is used and consumed on the premises. These improper and unauthorized uses of the mill powers and of water will throw the canals out of balance and will interfere with the legitimate use thereof by grantees to whom the plaintiff is obligated to deliver water for power purposes.

These allegations of facts so far as well pleaded must be accepted as true for the purposes of this decision.

Numerous causes of demurrer are assigned. They need not be examined one by one. In the main they relate to want of equity and to lack of sufficient certainty in the allegations. The issues raised and argued will be grouped for convenience.

1. One question is whether the defendant may use its mill powers interchangeably in whole or in part to suit its convenience on its several parcels granted at different times. The plaintiff contends that these mill powers may be used only on the land with which they were originally granted. The answer depends upon the terms of the grant. Those terms must be interpreted in the light of the material circumstances attending their use and in such manner as to bring to pass the main result designed to be accomplished by the transaction. All the words employed must be given a meaning consonant with the general import of the instrument. They must be so construed as to give effect to the apparent intent of the parties unless inconsistent

with some rule of law or repugnant to the terms of the grant. The grant of a right to enjoy a privilege commonly carries with it the use of means necessarily incident to its beneficial enjoyment. Either easements appurtenant or easements in gross with respect to water rights for power or for other purposes are permissible under the law, the nature of the particular easement depending upon the words whereby it is created, the concurrent conditions and the accompanying circumstances. *Goodrich* v. *Burbank*, 12 Allen, 459.

The particular facts relevant to the fifteen mill powers and the land granted therewith by the predecessor in title of the plaintiff, the Hadley Falls Company, to the Lyman Mills in 1854, and now owned by the defendant, are these: The grant, prefaced by a recital that the Lyman Mills had agreed to purchase of the Hadley Falls Company "the bulidings [*sic*] and parcels of land with mill-power as described in the annexed proposals" made a part thereof, was for one single consideration whereby four parcels of land described by metes and bounds were conveyed "Together with fifteen mill-powers at the upper fall of the power described in the annexed proposals, and to be used as therein set forth, with all the privileges and appurtenances to the same belonging . . . ." The grantor reserved the right of entry upon the demised premises for the purpose of repairing the dam, canals, water courses and waterways and removing obstructions therefrom. The proposals incorporated in the grant are entitled as being for the sale of its mill powers and land by the grantor, and state that the mill powers are to be drawn "through the land to be granted" and that the perpetual annual rent is reserved for "each mill power, with the land to which it is annexed." It further provides that the "land conveyed to the grantees of water power in connnection with the mill sites" shall be held and used subject to specified restrictions. There is also provision with respect to severance by sale of one or more of the several mill powers originally conveyed "with the proper and convenient part of the land." The votes of the stockholders of the Hadley Falls Company authorizing the sale

and of the Lyman Mills authorizing the purchase are significant of a common purpose that the mill powers are appurtenant to the land, the vote of the latter expressly empowering its directors "to purchase of the Hadley Falls Company their two cotton mills with the land and water privileges appurtenant thereto." These words of the grant and of the accompanying instruments, standing alone, have the effect of making the mill powers appurtenant to the land conveyed. This interpretation has confirmation in the onerous agreements resting upon the grantor. One of the purposes of its incorporation was to construct and maintain the dam, and to create and maintain a water power for the benefit of those to whom it sold or leased the power thus developed, and it assumed the contractual obligation forever to maintain and keep in repair the canals. It is not likely that such financial burdens would be assumed by a corporation of that nature with respect to mill powers in gross, nor with respect to mill powers not appurtenant to specified land. The implications of such a grant of mill powers are that they are appurtenant to some estate and that they are not personal. *Willets* v. *Langhaar*, 212 Mass. 573, 575.

The instruments of grant of the land and the six and one half mill powers now owned by the defendant, executed by the plaintiff and its original grantees in 1869, differ in no material particulars from those of the 1854 grant, already described, except that there were no corporate votes. Those grantees were individuals and not a corporation. The conclusions reached as to the effect of the 1854 transaction are equally applicable to the one of 1869. The mill powers thus granted were appurtenant to the land conveyed at the same time and as part of the same transfer. It follows that all these mill powers cannot be used interchangeably but can be used only on the parcels of land with which they were originally united. The present convenience or advantage of the defendant growing out of its ownership of these several parcels cannot overcome the plain terms of the instruments of grant. The nature and use of the mill powers and of the land must be determined from the instruments out

of which the titles had origin and not from subsequent changes in ownership. Compare *Boston Chamber of Commerce* v. *Boston*, 195 Mass. 338.

The five day mill powers of surplus water which the defendant is entitled to draw were transferred by indenture, dated April 1, 1882, between the plaintiff and the Lyman Mills and in accordance with regulations of the plaintiff adopted on September 17, 1881. The contention of the defendant that these mill powers are either easements in gross or are appurtenant to all parcels of land owned by it cannot be supported. This indenture contains the recital that the grant is made in settlement and discharge of the obligations of the plaintiff as the successor of the Hadley Falls Company under the indenture and agreement of the latter corporation with the Lyman Mills dated April 28, 1854. The tenor of the grant conforms to this recital. As already pointed out the fifteen permanent mill powers granted under the deed of April 28, 1854, were clearly made appurtenant to the land conveyed with them. The agreement between the same parties of even date with that deed obligated the Hadley Falls Company to convey to the Lyman Mills any additional mill powers requested by the latter provided at the time of such request the former had in its upper canal a sufficient quantity of water therefor not then sold or disposed of. These additional mill powers were to be held "for any of the uses or purposes set forth and declared in the" vote of the stockholders of the Hadley Falls Company whereby its treasurer was authorized to convey the land and buildings to the Lyman Mills with "sufficient water power to run at all times all the machinery now in or which may be put into the two cotton mills . . . or in any other mills which may be erected in the stead and place of the said mills, or in any mills which shall be erected on the lands to be conveyed to" the Lyman Mills. The grant of the five day mill powers of surplus water made in 1882 must be construed in the light of the deed and agreement of April 28, 1854, with which it is inseparably connected. Thus construed plainly the additional surplus mill powers were appurtenant to and to be used on the

parcels of land conveyed in 1854 and subject to the proposals of that year so far as applicable to surplus and nonpermanent mill powers. The long established practice of the plaintiff in never selling or leasing water rights except as appurtenant to some specified tract of land in connection with the development of its business indicates the importance attached by it to restrictions on interchangeable use of mill powers.

In our opinion the use by the defendant of its mill powers on or in connection with parcels of land other than those to which they were originally made appurtenant is unauthorized and contrary to the terms and conditions on which it holds such mill powers. The case at bar is distinguishable in its facts on this point from *Bardwell* v. *Ames*, 22 Pick. 333, *Cowell* v. *Thayer*, 5 Met. 253, *Hurd* v. *Curtis*, 7 Met. 94, and *De Witt* v. *Harvey*, 4 Gray, 486.

2. Another question is whether the defendant in the use of its mill powers is limited to the driving of water wheels. The defendant asserts the right also to use water for other purposes in manufacturing its product. It is to be observed in this connection that the defendant derives its rights exclusively by grant from the plaintiff and its predecessor. It is not a riparian proprietor. Rights to the use of water inherent in an owner of land upon a stream may be laid to one side. Rights in the use of water dependent entirely upon grant may be restricted to stated purposes and may not exceed those limitations. *Lincoln* v. *Lincoln*, 110 Mass. 449. *Walker Ice Co.* v. *American Steel & Wire Co.* 185 Mass. 463. *Lamb Knitting Machine Co.* v. *Chicopee Manuf. Co.* 273 Mass. 506, 517. The terms of the grant must be examined with care. The words of grant in this particular were of "mill-powers . . . of the power described in the . . . proposals, and to be used as therein set forth." The words "mill-powers" and "power" according to their natural signification import the production of power alone. "Mill power" is an expression designating a unit of water power. It is used in manufacturing communities where the development has been made by a corporation organized to acquire water and flowage rights, to erect a dam

and to construct canals or other appliances for the purpose of leasing or selling the power thus made available for valuable use. "Mill power" is the descriptive term frequently used to rate water power for the purpose of renting it. It indicates the amount of power due to a stated quantity of water used on the particular fall. It is a term of practical convenience in defining the quantity and weight of water available for use by the lessee. The actual amount of horse power developed may vary with the efficiency of the water wheels and other appliances supplied by the lessee. The definition of a mill power set out in the "proposal" and already quoted, being the right to draw thirty-eight cubic feet per second under a specified head and fall, may be translated into terms of horse power, when the character of the water wheel is known. The use of water for power according to common understanding means its application to a water wheel to the end that its energy under the specified head and fall may be utilized and converted into available force. The votes of the stockholders of the Hadley Falls Company touching the indentures of 1854 granting fifteen mill powers describe the water to be granted as "sufficient water power to run at all times all the machinery . . . ." of the grantee. The proposal further provides that each mill power is to be drawn "through the land to be granted." There cannot be compliance with that stipulation if the water is used or consumed on the land. That stipulation is apt to describe the use of water for the production of power. There are also explicit provisions in the proposals against waste of water. The terms of the instruments according to their natural meaning limit the use of the water granted to the production of power. This interpretation receives confirmation from the conditions confronting the parties at the times of the execution of the instruments. It appears to be important if not absolutely essential to the operation of the hydraulic system established by the plaintiff, whereby water used on the first level canal should pass to the second level canal for use there and again to the third level canal for use there, that the water be used for the production of power and not for con-

sumption on the premises in other manufacturing processes. The system of balancing the canals already explained seems to require that the water used on the first level canal pass on substantially undiminished in quantity for use on the lower levels. It is apparent that the hydraulic system of the plaintiff was designed primarily for the purpose of furnishing water for power and not the water itself. Its corporate powers are chiefly for that end. Its rights in the main are those of a riparian proprietor augmented by the special grant from the General Court. Its rights in the water are usufructuary. *Stratton* v. *Mount Hermon Boys' School,* 216 Mass. 83. The consumption of all the water for the mill powers of the defendant in manufacturing processes manifestly would be in excess of the rights even of a riparian owner: it would contravene the intention of all parties to the original transactions, and conflict with the owners of other mill powers and other obligations of the plaintiff of a like nature. Both the words of the instruments upon which the rights of the parties depend and the circumstances known to the parties at the time of the original transactions in the light of which the words were used and must be interpreted as alleged in the bill tend to the conclusion that the mill powers granted are to be utilized for the production of power.

If the term "mill power" be regarded as of doubtful signification and susceptible of special meaning in the science of hydraulics, then the allegations of the bill as to the meaning attached to the term by long established custom and usage become pertinent. The meaning of ambiguous terms in a contract may be ascertained by proof that a particular signification has become attached to them by reputation, usage of trade or otherwise. *Stoops* v. *Smith,* 100 Mass. 63, 66. *Martin* v. *Jablonski,* 253 Mass. 451, 456. In such cases also the practical construction placed upon such terms by the parties through a considerable period of time may be considered in determining the meaning and purpose of the contract. *Pittsfield & North Adams Railroad* v. *Boston & Albany Railroad,* 260 Mass. 390, 395. *Ovans* v. *Castrucci,* 267 Mass. 600, 605.

The united force of these factors is that the allegations of the bill are sufficient to show that the defendant in the use of its mill powers is limited to the production of power on water wheels.

Cases like *Ashley* v. *Pease*, 18 Pick. 268, *Tourtellot* v. *Phelps*, 4 Gray, 370, and *Pratt* v. *Lamson*, 2 Allen, 275, are distinguishable in their facts in this particular from the case set out in the bill.

3. Another question presented is whether the averments of the bill show with sufficient certainty the hours of the day during which the defendant is entitled to use its mill powers. The deeds do not expressly state those hours. The proposals of the Hadley Falls Company in declaring a mill power to be the right to draw specified water under the particular head "during sixteen hours in a day" do not delimit those hours. The indenture under which the defendant holds its right to draw six and one half permanent mill powers "during sixteen hours in a day" contains a further provision under certain conditions for the acquisition of the right "to draw water . . . the remaining eight hours of the twenty-four hours per day." The regulations of the draft of surplus water attached to the indenture of April 1, 1882, granting five day mill powers of surplus water define a day as "the time between six A.M. and ten P.M. of each working day," and a night as the time beginning at 10 P.M. of each working day and extending thence to 6 A.M. of the day succeeding. The agreement of the Lyman Mills of even date with this indenture refers to its twenty-one and one half mill powers as mill powers "to which we are entitled by day." The allegations of the bill further are that the mill powers owned by the defendant are known as sixteen-hour mill powers and, by well known and long established customs and usage and by the consent of the owners of said mill powers prior to the acquisition of them by the defendant and other owners of like mill powers, are mill powers the period of use of which is from 6 o'clock A.M. to 10 o'clock P.M. of each working day, and that the usual and customary daily hours of labor at and since the date of the grants to the predecessors in title of the defendant have been between and not outside

the same hours. It also appears that the mill powers and estates of the defendant were owned and operated up to the time of their purchase in 1927 by a corporation engaged in the manufacture of cotton goods. The collective effect of all these allegations is to show an interpretation put by the parties upon the term "sixteen hours in a day" in accord with common knowledge as to the maximum limitations of an ordinary working day. That interpretation receives also support from other phrases in the instruments defining rights of the parties not decisive in themselves but of some weight. All these considerations lead us to the conclusion that this interpretation especially because adopted by the parties is correct. *Winchester* v. *Glazier*, 152 Mass. 316, 323. The case on this point is governed by *Binney* v. *Phoenix Cotton Manuf. Co.* 128 Mass. 496, 498, 499. It is distinguishable from *Marcelle, Inc.* v. *Sol. & S. Marcus Co.* 274 Mass. 469.

4. The allegations of the bill sufficiently set forth a use of water by the defendant in excess of the quantity to which it is entitled. These allegations are in substance that the defendant is using or proposes and threatens to use for manufacturing processes, feed water, steam condensing and filtration purposes, not only its mill powers but also water obtained directly from the flume, connected with the canal of the plaintiff, by means of a filtration basin and pipes so that the water will not go through the water wheels of the defendant's mill but will be consumed upon its premises, and is so using and threatening to use for these last mentioned purposes water from the plaintiff's canals and water courses in addition to that required to develop its mill powers. Plainly these allegations are of a use of water by the defendant in excess of its rights and wholly without authority. They are sufficiently explicit in view of the nature of the subject. *Malden & Melrose Gas Light Co.* v. *Chandler*, 209 Mass. 354, 358. The proposals subject to which the defendant holds all its water rights expressly negative such withdrawals by the provision that the "grantees are not to use more water than is granted . . . ."

5. The complaints set out in the bill are of a nature which

entitle the plaintiff to relief in equity. The interference with the hydraulic system established by the plaintiff and the consequent disturbance of the plaintiff in the performance of its obligations to others constitute an appropriate field for the exercise of remedies afforded by equity. The use of water for an unauthorized purpose or purposes is also a ground for equitable relief. This point is sufficiently covered by authority and need not be amplified. *Bliss* v. *Rice,* 17 Pick. 23, 39. *Bardwell* v. *Ames,* 22 Pick. 333, 353, 354. *Whitney* v. *Fitchburg Railroad,* 178 Mass. 559.

The remedies supplied to the plaintiff by the terms of the instruments to stop the water from entering the flume and also to maintain an action at law for damages are not exclusive. There is nothing to indicate an intention that other appropriate action in the courts should not be available to the plaintiff. *Finkelstein* v. *Sneierson,* 273 Mass. 424, and cases cited. *Boston, Barre & Gardner Railroad* v. *Wellington,* 113 Mass. 79, 87.

The result is that the demurrer must be overruled and the case is to stand for further proceedings.

*Ordered accordingly.*