## HOLYOKE WATER POWER CO. v. AMERICAN WRITING PAPER CO., Inc.

### No. 4015.

District Court, D. Massachusetts.

Dec. 31, 1936.

Warren, Garfield, Whiteside & Lamson, Bentley W. Warren, and Howard Stockton, Jr., all of Boston, Mass., Avery, Gaylord, Healy & Button, Nathan P. Avery, and James M. Healy, all of Holyoke, Mass., and Samuel Williston, of Cambridge, Mass., for plaintiff.

Russell L. Davenport, of Holyoke, Mass., and Choate, Hall & Stewart, John L. Hall, Charles P. Curtis, Jr., and Claude R. Branch, all of Boston, Mass., for defendant.

McLELLAN, District Judge.

This is a bill in equity to restrain an alleged abuse of certain water power privileges conveyed at various times by the complainant to predecessors in title of the respondent. The case was referred to a special master, whose report was filed February 14, 1936. The case is now here on exceptions to the master's report.

The fundamental issues presented by the complainant's exceptions, as stated in its brief, are:

"The Issues Presented.

"The complainant believes that the fundamental issues raised by its exceptions can be reduced to two:

"I. Whether water power which is employed in the generating of electricity which is in turn used to operate machinery, is used at the place where the water power is applied to the water wheels, at the place where the power from the wheels is applied to the generator, or where the load (viz. the machinery) is.

"The complainant believes that the third alternative embodies the correct principle.

"II. Whether the use of the water power granted in terms of mill powers and involved in this case was restricted to the several mill sites to which the various grants were made appurtenant.

"The complainant believes that this question should be answered in the affirmative."

In view of the conclusion here about to be reached, the respondent's exceptions to the master's report need not be set forth.

The facts as found by the master, in so far as material to the issues raised by the present exceptions, are substantially as follows:

The complainant owns and maintains a water power system in the city of Holyoke, Mass., deriving its power from the Connecticut river. The complainant was organized in 1859, and at that time took over the rights of an earlier company, the Hadley Falls Company, engaged in the same business at the same place. The complainant's system consists of a dam across the Connecticut river at Holyoke, and a network of canals used to distribute the power made available at the dam to various mill sites along the river. There are three principal canals, built one above the other, on the Holyoke side of the river, on land which slopes downward to the edge of the river. On the lower side of each canal are mill sites. Flumes passing through the various mill sites connect the canal on the upper side of each site with that on the lower side, or with the river, as the case may be. Power is developed by water wheels located in the flumes.

The complainant, or its predecessor, at one time owned large quantities of land, located along the canals. This land has been sold to persons wishing to engage in manufacturing in Holyoke. In connection with such sales of real estate, the complainant, or its predecessor has granted "mill powers," which are carefully defined in the grants so made.

In 1899, the American Writing Paper Company of New Jersey purchased some twenty mill sites granted in this manner, together with such mills as had been constructed thereon. In 1927, the respondent was organized under the laws of Delaware, and succeeded to the rights and property of the New Jersey corporation. The respondent has organized its mills into twelve "divisions," so that some of these divisions contain more than one mill site. The present controversy deals with the use being made of the water power on five divisions. On each of these divisions, the respondent has installed at least one generator. These generators all work into a common electric transmission line, which serves all five divisions. Under this arrangement, electricity generated on one mill site is being consumed on other sites. When the respondent's generators are unable to meet the load, power is purchased from outside.

The complainant contends that under the terms of the indentures originally granting the land and the mill powers now held by the respondent, the latter may not use the water power to generate electricity, and then transmit the electricity to sites other than the one upon which it is generated. The respondent urges that the only limitation to be found in the indentures is that it will use its mill powers to turn water wheels on the various sites in connection with which they were originally granted.

All grants of water power were made on the basis of a set of proposals, drawn by the complainant. These proposals were annexed to and made a part of all indentures granting water power, and are the same in all the indentures here involved. The indentures themselves are not identical in language. Thirteen indentures are involved in the present case, the earliest being dated in 1864, and the latest in 1895. Those indentures numbered as Exhibits 4, 5, 1, 9, 13, 12, and 3 granted a described mill site, "together with ———— mill powers at the ———— fall, of the power described in the annexed proposals, and to be used as therein set forth. * * *"
Three of these indentures, those numbered

1, 4, and 9, give an option for the purchase of additional mill powers, "the same to be annexed to and form a part of the hereby granted premises," followed by language similar, but not identical, in all three, indicating that such additional mill powers are to stand on the same footing as those originally granted. Exhibit 11 also contains a grant of a mill site, "together with the right appurtenant to the land aforesaid to take and use five non-permanent 24 hour mill powers." Exhibits 2, 7, 8, and 10 are grants of additional mill powers to the owners of sites previously granted. All contain the language "to be drawn and used in and upon" the land or site referred to. Exhibit 8 adds "and as appurtenant thereto." Exhibit 6 grants land without mill powers to be annexed to another site.

Article II of the proposals provides: "Each power at the respective falls is declared to be the right, during sixteen hours in a day, to draw from the nearest canal or water course of the grantors, and through the land to be granted, thirty-eight cubic feet of water per second at the upper fall, when the head and fall there is twenty feet—or, a quantity inversely proportionate to the height, at the other falls. * * *"

▮ The master concluded correctly that what is granted in these indentures is water power, and not merely a specified quantity of water. Holyoke Water Power Company v. Whiting & Co., Inc., 276 Mass. 528, 177 N.E. 568; Holyoke Water Power Company v. American Writing Paper Company, Inc. (Equity No. 4000) 17 F. Supp. 879, District Court of the United States, District of Massachusetts.

The complainant says that transmission of power by electricity cannot be made to stand on any different footing from simpler means of transfer, such as by shafts or belting, and that the provisions of these indentures are such as to prohibit the respondent from doing anything with the mechanical power available at its water wheels except to apply it to mill machinery on the site where it is developed. The respondent contends that so long as the water power in question is applied to wheels on the site to which it is annexed, and so long as no attempt is made to sell the mill powers separately from the sites in connection with which they were originally granted, the respondent is free to do what it pleases with the power made available at its wheels. In any event, the respondent argues, the generation of electricity is no different from the production of any other commodity, from a business man's point of view at least, and hence if the power is applied to generators on the correct sites, the respondent is within its rights.

The master states that generation and transmission of electricity are commonly distinguished, and hence, if the generation is accomplished on the sites to which the mill powers being used to drive the generators are annexed, there is nothing in the indenture forbidding the transmission elsewhere of the electricity so generated. While in accord with the result reached by the master, I regret that in the light of a decision which had not been published when his report was filed I am unable to agree with one of the ways in which he arrives at his conclusion. See Ashwander v. Tennessee Valley Authority, infra.

If these indentures, fairly construed, forbid the application of power available at the water wheels on any particular site to ordinary mill machinery located on any other site, then this respondent ought not to be allowed to circumvent any such provisions by the use of electricity. While it may be that electricity is sometimes spoken of as a separate commodity, in fact it is of no use to anybody, except as a convenient means for the transfer of power. As the master has found, a generator may turn all day at full speed, and yet, unless somebody attempts to use the power so made available, no current flows; not a single electron is moved. It is a familiar thing to find mills replacing cumbersome and dangerous belting and shafting with individual electric motors for each machine, and a common generator driven by whatever source of power is available at the mill. Such a change is made merely in the interests of economy and safety; it is not thought of as involving the manufacture of a new commodity. The master relies upon two cases to support his view. In Duncan v. New England Power Company, 225 Mass. 155, 113 N.E. 781, a hydroelectric power station was held to be a "water mill" within the meaning of the words "water mill" as used in a Massachusetts statute. In Utah Power & Light Company v. Pfost, 286 U.S. 165, 52 S. Ct. 548, 76 L.Ed. 1038, a state tax on the generation of electricity, carried by transmission lines into other states, was held to be a tax on intrastate commerce, which

the state could lawfully levy. While both of these cases contain statements tending to support a conception of the generation of electricity as the manufacture of a separate commodity, they do not go so far as to hold that the generation and transmission of electricity accomplish anything but transfer of power.

Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L. Ed. 688, supports the conception of electricity as essentially an improved means for the transfer of power, and not as the manufacture of a separate commodity. In that case, the power of the federal government under the Constitution of the United States to acquire certain power lines for the purpose of marketing electricity generated at Wilson Dam was in issue. The court held that Wilson Dam was constructed within the war powers of the federal governments, and that the government was the owner of power incidentally made available in time of peace by the development. It was then argued that although the government had a right to dispose of the mechanical energy which it owned, it did not have the power to go into the business of manufacturing electricity for sale to the general public. The court held that the government was entitled to seek the widest possible market for its property, and that the generation of electricity, and its transfer by transmission lines to centers of population was merely a means of bringing the government's property to a wider market, and said, 297 U.S. 288, at page 339, 56 S.Ct. 466, 479, 80 L.Ed. 688: "We limit our decision to the case before us, as we have defined it. The argument is earnestly presented that the government by virtue of its ownership of the dam and power plant could not establish a steel mill and make and sell steel products, or a factory to manufacture clothing or shoes for the public, and thus attempt to make its ownership of energy, generated at its dam, a means of carrying on competitive commercial enterprises, and thus drawing to the federal government the conduct and management of business having no relation to the purposes for which the federal government was established. The picture is eloquently drawn, but we deem it to be irrelevant to the issue here. The government is not using the water power at the Wilson Dam to establish any industry or business. It is not using the energy generated at the dam to manufacture commodities of any sort for the public. The government is disposing of the energy itself which simply is the mechanical energy, incidental to falling water at the dam, converted into the electric energy which is susceptible of transmission."

It becomes necessary to inquire, therefore, whether there is anything in these indentures, or in the annexed proposals, which prohibits the respondent from using the water powers conveyed for any purpose except to drive mill machinery located upon the premises to which the mill powers are respectively attached. No such restriction is here to be found.

A considerable number of the indentures contain no express words which could possibly be construed as limiting the respondent in the ultimate location of his machinery. The most that can be found in any of the grants is a stipulation that mill powers are to be used on the land with which they are granted. Can this be construed to mean that the grantee may not connect his wheels to machinery located on other lots, or does it merely mean that the grantee must use the mill powers upon water wheels located on the granted premises?

Water power exists in potential form in water standing at a head. If the water is then allowed to fall to the level below, it loses its potential energy, becomes kinetic, and is either expended in turning a water wheel, or is dissipated in the raceway below the mill. The water power is used when it is allowed to come in contact with wheels to which have been attached appropriate devices. As stated by Chief Justice Rugg in Holyoke Water Power Company v. Whiting & Co., Inc., 276 Mass. 528, 177 N.E. 568, 572: "The use of water for power according to common understanding means its application to a water wheel to the end that its energy under the specified head and fall may be utilized and converted into available force."

The complainant argues that unless the words of limitation are given the meaning for which it contends, they will have no effect whatsoever, and might as well have been omitted. This is not the case. It was of importance to the complainant to have the mill powers drawn only through the land to which they were attached for at least two reasons. Considerations of hydraulic engineering made it desirable that the complainant know just where it would be called upon to deliver its water.

Otherwise it might be difficult or impossible to maintain a proper balance in the various canals. Furthermore, since the grants contemplated that the complainant would continue to maintain the dam and power systems, a perpetual rent was reserved by the terms of the annexed proposals in all the indentures. The requirement that each mill power be drawn through the pertinent site tended toward an enhancement of the latter's value and rendered more likely the payment of the perpetual rent.

It is argued by the complainant that since the mill powers were all appurtenant to land, the privilege must be used only on the land for the benefit of which it was created. This may be conceded, but it does not help one to determine whether the indentures contain a restriction on the place of the use of the water power, or, if so, whether such restriction involves a limitation as to the place where the ultimate load is to be attached.

These indentures, and the attached proposals, were carefully drawn and were intended to serve as a basis for the relations of the parties and their successors for a long time. Under these circumstances, the well-known rule that grants are to be construed against the grantor is applicable. The restriction for which the complainant contends would have been severe, even when these indentures were drawn. With the passage of time, it was likely to become more so. Under such circumstances, as pointed out by the master, it is not to be lightly implied. In the present case, the effect might well be to prevent the respondent from modernizing its plant to meet competition, except by sacrificing to a considerable extent the mill powers acquired from the complainant. See Ashley v. Pease, 18 Pick. (Mass.) 268, and Tourtellot v. Phelps, 4 Gray (Mass.) 370.

The use of the water power granted in terms of mill powers is not so restricted in the proposals and indentures to the mill sites as to prevent the transmission of electric power generated on such sites to the load located elsewhere.

In view of the foregoing, the master's rulings on which the respondent bases its exceptions involve in this court no prejudice to the respondent. All exceptions to the master's report are overruled, and the report is confirmed.

A decree dismissing the bill is to be entered.